## UNITED STATES of America, Plaintiff-Appellee,

v.

## Guillermo Rhodes CRUZ, Defendant-Appellant.

### No. 76–3527.

United States Court of Appeals, Fifth Circuit.

Oct. 6, 1978.

Brown, Chief Judge, dissented and filed opinion in which Ainsworth, Circuit Judge, joined in part.

Gee, Circuit Judge, dissented and filed opinion in which Ainsworth and Vance, Circuit Judges, joined.

Tjoflat, Circuit Judge, dissented and filed opinion in which Ainsworth and Vance, Circuit Judges, joined and Brown, Chief Judge, joined in part.

Before BROWN, Chief Judge, THORN-BERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, MORGAN, CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, and VANCE, Circuit Judges.*

ALVIN B. RUBIN, Circuit Judge:

Because the economic opportunities and political freedom offered by the United States irresistibly attract illegal immigrants across the longest unfortified borders in the world, law enforcement authorities are faced with a continuing duty to stem the illicit influx that violates our laws, deprives domestic workers of jobs, and creates innumerable other problems that the immigration laws were designed to prevent. This task must, however, be performed with due regard to the Fourth Amendment to the Constitution, which affords citizen and alien alike protection against illegal stops, searches, and arrests. To determine whether a person engaged in assisting unlawful immigration was apprehended by lawful means, we consider en banc the validity of the action of a state police officer in stopping a motor vehicle being driven on a Texas State Highway, 25 miles from the border of the United States with Mexico. *See United States v. Brignoni-Ponce*, 1975, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607.

I.

The security of citizens against arbitrary police intrusion into places of privacy is at the core of the Fourth Amendment proscription against unreasonable searches of private citizens and seizures of their property. *Wolf v. Colorado*, 1949, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782, 1785. If evidence, therefore, is illegally seized by a federal officer, it may not be used in a federal prosecution, *Weeks v. United States*, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652; nor may a federal prosecutor employ evidence illegally obtained by a state police officer, *Elkins v. United States*, 1960, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669. *See also Mapp v. Ohio*, 1961,

Gustavo L. Acevedo, Asst. Federal Public Defender, Laredo, Tex., Roland E. Dahlin, II, Federal Public Defender, Karen K. Friedman, Asst. Federal Public Defender, Houston, Tex., for defendant-appellant.

J. A. Canales, U. S. Atty., Mary L. Sinderson, George A. Kelt, Jr., Asst. U. S. Attys., Houston, Tex., Rene Gonzalez, Asst. U. S. Atty., Laredo, Tex., James R. Gough, Anna E. Stool, Asst. U. S. Attys., Houston, Tex., for plaintiff-appellee.

* Judge Goldberg did not participate in the consideration of or decision in this case.

367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.[1] Not only must the evidence illegally obtained itself be excluded, but evidence located as a result of information secured by an illegal search is likewise inadmissible, *Silverthorne Lumber Co. v. United States*, 1920, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319; *Nardone v. United States*, 1939, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307, unless the connection between the illegal search and the evidence thereafter obtained has become "so attenuated as to dissipate the taint." *Nardone v. United States, supra*, 308 U.S. at 341, 60 S.Ct. at 268, 84 L.Ed. at 312; *United States v. Ceccolini*, 1978, 435 U.S. 268, 274, 98 S.Ct. 1054, 1059, 55 L.Ed.2d 268, 275–76.

▪▪▪ Even federal officers on roving patrols assigned the mission of searching for illegal immigrants or smuggled contraband may stop vehicles "only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *United States v. Brignoni-Ponce, supra*, 422 U.S. at 884, 95 S.Ct. at 2582, 45 L.Ed.2d at 618. Evidence obtained as a result of a stop that is not warranted by this standard must be suppressed. *Id.* Out-of-court statements and other verbal evidence derived immediately from unlawful police action or from an unlawful arrest must also be excluded unless the evidence was obtained by "means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 1963, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455; *see also United States v. Brignoni-Ponce, supra.*

The application of these doctrines to the in-court testimony of witnesses located as a result of an illegal search has recently been clarified in *United States v. Ceccolini, supra.* In *Ceccolini*, the Supreme Court held that, if the exclusion of the proffered testimony of a witness identified or located as a result of an illegal search would efficaciously serve the remedial objectives of the exclusionary rule, that evidence must be excluded. If, on the other hand, after striking a balance of the interests involved, exclusion of the testimony would bear no "relation to the purposes which the law is to serve," 435 U.S. at 279, 98 S.Ct. at 1062, then it should be admitted. The decision in *Ceccolini* requires us to re-examine the conviction of the defendant obtained as a result of the testimony of the witnesses arrested after the stop of a defendant's automobile and the consequent arrest of defendant and the witnesses.

## II.

The defendant, Guillermo Rhodes,[2] was convicted after a jury trial of conspiracy to

---

1. The purpose of the exclusionary rule is to deter police misconduct, *Stone v. Powell*, 1976, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067; *United States v. Calandra*, 1974, 414 U.S. 338, 347, 94 S.Ct. 613, 619–20, 38 L.Ed.2d 561, 571; *Terry v. Ohio*, 1968, 392 U.S. 1, 29–30, 88 S.Ct. 1868, 1883–84, 20 L.Ed.2d 889, 910–11; *Linkletter v. Walker*, 1965, 381 U.S. 618, 636, 85 S.Ct. 1731, 1741, 14 L.Ed.2d 601, 613. Because not only the benefits but also the costs of the exclusionary rule are substantial, its application is "restricted to those areas where its remedial objectives are thought most efficaciously served." *United States v. Calandra, supra*, 414 U.S. at 348, 94 S.Ct. at 620. Chief Justice Burger has stated that effective action by Congress to deter illegal police activity in some other fashion might occasion reconsideration of the exclusionary rule, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 1971, 403 U.S. 388, 421, 91 S.Ct. 1999, 2017, 29 L.Ed.2d 619, 641 (Burger, J., dissenting), and more recently has gone the next step to suggest that the rule must be abolished if legislative alternatives are to be encouraged, *Stone v. Powell*, 1976, 428 U.S. 465, 500–01, 96 S.Ct. 3037, 3055, 49 L.Ed.2d 1067, 1091–92 (Burger, J., concurring). Although not specifically adopting the Chief Justice's suggestions, recent cases have expressed concern over the great costs of the exclusionary rule as compared with the uncertain benefits derived therefrom. *See, e. g., Stone v. Powell, supra; United States v. Janis*, 1976, 428 U.S. 433, 448–49, 96 S.Ct. 3021, 3029, 49 L.Ed.2d 1046, 1058; *Schneckloth v. Bustamonte*, 1973, 412 U.S. 218, 266–69, 93 S.Ct. 2041, 2068–69, 36 L.Ed.2d 854, 885–87 (Powell, with whom Burger and Rehnquist joined, concurring).

2. The defendant's full name is Guillermo Rhodes Cruz. However, Rhodes is his patronymic name; Cruz is his mother's family name.

transport illegal aliens and three counts of transporting illegal aliens.[3] His conviction was affirmed by a panel of this court, *United States v. Cruz*, 5 Cir. 1977, 559 F.2d 300, Coleman, J., dissenting. As the facts set forth in the panel opinion demonstrate, the validity of this conviction was sustained on the basis that Rhodes was legally stopped by a State Deputy Sheriff when he was driving on a Texas highway; moreover, the testimony of the illegal aliens found in his automobile was held admissible, and this of itself provided sufficient evidence to sustain the conviction. Contrary to the panel decision, we find clearly erroneous the district court's implied conclusion of fact[4] that appellant's car was stopped in good faith for traffic control purposes; for the reasons set forth below, we conclude that Rhodes and his vehicle were halted as a pretext to search for illegal aliens. This conclusion requires us to re-examine the admissibility at trial of the testimony of the auto's occupants. We conclude that the testimony was a direct result of the illegal stop and resultant illegal arrest, that to exclude it would serve the purposes of deterring illegal searches in the future and therefore, that it was inadmissible. There being no other evidence to support the conviction, it is reversed.

### III.

▇ Like the panel, we begin with the rubric that, if the initial stop was legal, the deputy sheriff had the duty to investigate suspicious circumstances that then came to his attention. *United States v. Faulkner*, 5 Cir. 1974, 488 F.2d 328, 330, *cert. denied*, 1974, 417 U.S. 914, 94 S.Ct. 2614, 41 L.Ed.2d 218. *See also United States v. Freund*, 5 Cir. 1976, 525 F.2d 873, 875, *cert. denied*, 1976, 426 U.S. 923, 96 S.Ct. 2631, 49 L.Ed.2d 377; *United States v. Edwards*, 5 Cir. en banc 1978, 577 F.2d 883. If, however, the initial stop was not for a valid purpose, then observations made during the stop may not serve as a basis for further search. *Amador-Gonzalez v. United States*, 5 Cir. 1968, 391 F.2d 308. *See also United States v. Davis*, 5 Cir. 1970, 423 F.2d 974, 977–78, cert. denied, 1970, 400 U.S. 836, 91 S.Ct. 74, 27 L.Ed.2d 69; *Texas v. Gonzales*, 5 Cir. 1968, 388 F.2d 145. *Compare United States v. Kaiser*, 5 Cir. 1977, 545 F.2d 467.

The panel decision fairly recites the facts. We recount them because, in our view, some of the factual circumstances require greater emphasis and because, while a majority of the panel was merely troubled by the conclusion the trial court reached, we, like our brother who dissented, consider it clearly erroneous. The testimony most favorable to the prosecutor is that of the arresting officer, Deputy Sheriff Muldraw, and we necessarily adopt the view of the facts supported by his account. *Glasser v. United States*, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

Deputy Muldraw was employed full time in private industry. In addition, he served as a deputy sheriff and was on 24-hour call even when engaged in private work. He had been a deputy for about three months but had received no training. He had never been called away from work to serve as a deputy. His private employer knew he was a deputy sheriff but he had never discussed with his employer the possibility that he might be called to police duty while at work. He had made arrests of specific individuals on instructions from a superior, but, on his own initiative, he had made arrests on only "a couple"—or "several"—occasions when he arrested aliens and turned them in to the Border Patrol. He had never made an arrest of any kind for a state offense on his own initiative.

On May 18, 1976, between 9:00 and 10:00 a. m., in broad daylight, Deputy Muldraw was driving west on State Highway 359 in

---

**3.** In violation of 8 U.S.C. § 1324(a), 1324(a)(2) and 18 U.S.C. § 371. He was sentenced to four concurrent two-year terms. In addition, probation on a ninety-day sentence for a prior similar offense was revoked and defendant was ordered to serve that sentence concurrently with the two-year sentences imposed here. He was released on bond pending this appeal.

**4.** The district court merely denied a motion to suppress; it made no findings in support of its conclusion.

his private vehicle, a pick-up truck, which bore no police identification. Although not in uniform, he was technically on duty because he was going to Laredo to have a two-way radio installed in his pick-up truck by the Sheriff's Department. As he approached Laredo, he ascended a hill.[5] As he did so, he observed a 1966 Pontiac traveling west on the shoulder of the highway at a slow speed, with its right turn indicator on. A yellow stripe on the highway indicated that this was an area in which it was illegal for one automobile to pass another on the highway. After the deputy passed the Pontiac and descended the hill, he kept looking in his rear-view mirror but did not see the Pontiac come over the hill.

Deputy Muldraw said he thought that, perhaps, the Pontiac had "car trouble or whatever," so he turned around to see if he could be of some assistance. When he returned to the place where he had seen the Pontiac, it had turned around and was traveling east. Concluding that the Pontiac had made an illegal U–turn, he followed it one mile toward the town of Aquilares, to a cut-off, Highway 2859.[6] At this point the deputy blinked his lights on and off, honked his horn, pulled up beside the Pontiac and asked the driver to pull over.

Upon Deputy Muldraw's request, the driver defendant, Rhodes, presented his driver's license which was valid. Deputy Muldraw testified that, when he looked the passengers over, they seemed nervous. The one in the front seat was dressed neatly but not the three in the back. This aroused his suspicions so he asked the passengers for identification. The passenger in the front seat presented a green card (apparently the permit allowing a Mexican national access to the zone in the United States 25 miles

from the border for 72 hours) which the deputy "suspected" was not valid. Because the passengers in the back seat had no identification, he arrested all of the occupants of the automobile, ordered the passengers to get in the back of his pick-up, and had Rhodes follow him in the Pontiac to the Border Patrol office in Hebbronville, where he turned all of them in.

Although Deputy Muldraw testified that he pursued and stopped the Pontiac "merely to warn [the driver] of his violation and the danger of a U-turn at the point at which he made it" and to "check" the driver's license, he never then or later even gave the driver any warning about violating the traffic laws, nor did he arrest him for doing so.

## IV.

■ Like the panel, we are reluctant to reverse the factual conclusions of the trial judge. Rule 52 of the Federal Rules of Civil Procedure, states: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." The "clearly erroneous" rule is not set forth explicitly in the Federal Rules of Criminal Procedure but the same standard applies to findings of fact made by the court in criminal cases. *Campbell v. United States,* 1963, 373 U.S. 487, 493, 83 S.Ct. 1356, 1360–61, 10 L.Ed.2d 501, 507; *United States v. Juarez,* 5 Cir. 1978, 573 F.2d 267, 273; *United States v. Crouch,* 5 Cir. 1978, 566 F.2d 1311, 1318; *United States v. Carrillo,* 5 Cir. 1977, 561 F.2d 1125, 1128–29; and *United States v. Griffin,* 5 Cir. 1977, 555 F.2d 1323, 1324. We have attempted faithfully to comply with this mandate, not merely out of adherence to its command but also because it is

---

**5.** This rise in the highway is referred to in the testimony many times as a hill. At other times there is testimony about an overpass.

**6.** The panel opinion states, "he had to pursue the Pontiac some distance before his honking and pulling alongside the car convinced its driver to stop." Deputy Muldraw's testimony at the hearing on the motion to suppress was:

Q. What did you do after you observed that illegal U-turn had been made?

A. I proceeded and followed him—well, all the way to Aguilares to the cutoff. It's 2859 where he turned to the left, where I stopped him.

Later, at the trial, he said:

A. I just followed him. He was traveling a great deal faster than when he had his indicator on. I thought I would go ahead and pursue him and stop him and give him that warning.

based on sound jurisprudential considerations. The trial judge has observed the appearance and demeanor of the witnesses and heard their voices; he has breathed in the atmosphere of the courtroom and observed the multitudinous details that do not appear on the record. We see but the insentient notations on a typed manuscript.

Moreover, most fact questions ought to be decided in the trial court, for the primary institutional function of the *nisi prius* judge is to hear and decide cases. The dual function of appellate courts is to review the record of trials for alleged error and, incident thereto, to announce and apply principled rules for the guidance of trial courts, lawyers, and litigants. Thus the appellate opinion not only gives the reasons for the court's decision in today's case; it guides lower courts in cases that arise in the future, and it enables the bar to predict the outcome of litigation, thus enabling counsel to avoid or settle future controversies. These purposes are ill-served by appellate re-evaluation of the facts.

To these ends, we have applied the clear error rule in a host of cases. It will suffice to refer to the two leading treatises which, listing only examples, cite pages of cases from this and the other circuits. *See* 5A Moore's Federal Practice, ¶ 52.03[1], at page 2628 [33 pages] (2d ed. 1977); 9 Wright and Miller, Federal Practice and Procedure, § 2577 (1st ed. 1971). The rule is equally applicable in habeas corpus cases. *Wade v. Mayo*, 1948, 334 U.S. 672, 68 S.Ct. 1270, 92 L.Ed. 1647; *Parnell v. Wainwright*, 5 Cir. 1972, 464 F.2d 735; *Perkins v. Henderson*, 5 Cir. 1969, 418 F.2d 441; *Johnson v. Ellis*, 5 Cir. 1961, 296 F.2d 325, *cert. denied*, 1962, 369 U.S. 842, 82 S.Ct. 873, 7 L.Ed.2d 846; Moore's Federal Practice, *supra*, ¶ 52.03[3], at page 2671; Wright & Miller, *supra*, § 2573. *See also Von Moltke v. Gillies*, 1948, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309; *Holiday v. Johnston*, 1941, 313 U.S. 342, 550, 61 S.Ct. 1015, 85 L.Ed. 1392.

We are aware of The Doubtful Omniscience of Appellate Courts, *see* Wright, in an article having that title, 41 Minn.L.Rev. 751 (1957). The record reaches us in what

may be either "gigantesque bundles" or "in a deceptively slender fagot of papers." Traynor, *La Rude Vita, La Dolce Giustizia* ; or Hard Cases Can Make Good Law, 29 U.Chi.L.Rev. 223, 225 (1962). In either form it is desiccated, an embalmed vestige of the life of the courtroom. Like Justice Traynor, we "recognize the common sense in a distribution of responsibility that normally precludes an appellate court from reassessing probabilities that the triers of fact have assessed at close range." *Id.* at 226.

Yet the appellate court has not only the power to set aside findings of fact that are clearly erroneous, as Rule 52 provides, but the duty to do so. The finder of fact is entitled to respect but not to a patent of infallibility. Our factual review "calls for the utmost scruple," *Watts v. Indiana*, 1949, 338 U.S. 49, 51, 69 S.Ct. 1347, 1348, 93 L.Ed. 1801, 1804. It should be exercised only when the reviewing court, "on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766. *See also* cases cited in Committee Note, Advisory Committee on Federal Rules, concerning amendments proposed in 1955, cited in Moore's Federal Practice, *supra*, ¶ 52.-01[7], p. 2608.

In the present case, we are left with that definite and firm conviction. *Cf. Amador-Gonzalez v. United States*, 5 Cir. 1968, 391 F.2d 308. *Compare United States v. Hernandez-Lopez*, 9 Cir. 1976, 538 F.2d 284, *cert. denied*, 1976, 429 U.S. 981, 97 S.Ct. 494, 50 L.Ed.2d 590, where there was a valid stop initially because the car did not have a current year registration sticker. Our appraisal of the facts, viewed in the light most favorable to the prosecution, leads us to the conclusion that Deputy Muldraw stopped the Pontiac for the sole purpose of searching for aliens. It is not suggested that he had any cause to conduct such a search, let alone cause that was probable. However credible the officer

may have appeared to be when he testified, our experience as human beings, as lawyers, and judges, prevents our being gullible enough to think that an untrained, part-time deputy sheriff, while only technically on duty because he was en route to get a radio installed in his own pick-up truck, went out of his way to turn around, follow a motorist for a mile, and then stop him merely to proffer the advice, "You must have made a U-turn a mile or so back there, and I want to warn you that you must not do it again." We are left with the firm conviction that Deputy Muldraw was hunting for illegal aliens and stopped Rhodes's automobile in order to inspect its occupants.

## V.

▆▆▆▆ Because the defendant was the victim of the illegal stop of his own automobile at a time when it was being driven by him, there can be no doubt of his standing to urge suppression of the evidence obtained during and as a result of that search. · *Alderman v. United States*, 1969, 394 U.S. 165, 171–72, 89 S.Ct. 961, 965, 22 L.Ed.2d 176, 185–86; *United States v. Brignoni-Ponce, supra.* Rhodes's rights were violated when his automobile was stopped, he was questioned, and passengers in his car were inspected. He has the same standing to object to inspection of his passengers as he would have to object to inspection of his cargo. The subsequent interrogation of the passengers was the fruit of the illegal search. The statements in our decisions in *United States v. Breedlove*, 5 Cir. 1971, 444 F.2d 422, and *United States v. Allen*, 5 Cir. 1976, 537 F.2d 1387, *cert. denied*, 1977, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803, with respect to standing to urge the suppression of testimonial evidence that resulted from a search contended to be invalid, must be re-evaluated in the light now afforded by *Brignoni-Ponce, supra*, and *Ceccolini, supra*, and, to the extent that they are inconsistent, they are overruled.

▆▆▆▆ Rhodes's counsel filed a motion in advance of trial to suppress the evidence obtained as a result of the stop of the Pontiac. It was denied, and, thereafter, at the trial, his counsel neither repeated the motion nor objected to admission of the testimony. The failure to reiterate the objection did not waive it. *Lawn v. United States*, 1958, 355 U.S. 339, 353, 78 S.Ct. 311, 319, 2 L.Ed.2d 321, 332. Later, he did his best to turn that evidence to his favor, but this, too, does not constitute a waiver. *United States v. Edmonds*, 1975, 173 U.S. App.D.C. 241, 243 n.10, 524 F.2d 62, 64 n.10; *cf. United States v. Mireles*, 5 Cir. 1978, 570 F.2d 1287, where the motion to suppress was carried with the case to the trial, but the defense counsel never sought a ruling on it during trial, and *United States v. Elmore*, 4 Cir. 1970, 423 F.2d 775, *cert. denied*, 1970, 400 U.S. 825, 91 S.Ct. 49, 27 L.Ed.2d 54, where defense counsel affirmatively stated "no objection" to evidence admitted after a pretrial hearing in which the trial judge indicated that he would probably admit the evidence if offered but apparently made no formal ruling.

## VI.

The conviction of the defendant could not be supported without the testimony of the occupants of the Pontiac. Two of them testified against him at the trial on July 26, two months after their arrest. Because they were illegal aliens, subject to deportation, they were presumably kept in custody in the interim. It is clear that evidence obtained during the period when the automobile was illegally detained and immediately thereafter must be suppressed; whether the testimony of the occupants of the automobile proffered at the trial—months later—should have been suppressed must be decided according to the standards set forth in *United States v. Ceccolini*, 1978, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268, a decision announced only after the panel opinion and therefore not available to it.

The Supreme Court there refused to "adopt what would in practice amount to a *per se* rule that the testimony of a live witness should not be excluded at trial no matter how close and proximate the connection between it and a violation of the Fourth Amendment." 435 U.S. at 274–275,

98 S.Ct. at 1059, 55 L.Ed.2d at 276. Instead it concluded that, if a witness is located as a result of a search unconstitutional under the Fourth Amendment, the admissibility of the witness's testimony depends upon a balancing test; the court should consider: (1) the degree of free will exercised by the witness in testifying (because the greater the willingness of the witness to testify freely, the greater the likelihood that he would have been discovered by legal means and, consequently, the smaller the incentive to the police to conduct an illegal search to discover witnesses); (2) the time, place and manner of the initial questioning of the witness (as indicating whether the statements are truly the product of detached reflection and the witness's desire to be cooperative and whether the illegality that led to discovery of the witness played any meaningful part in the witness's willingness to testify); and (3) the relationship of the purpose of the originally illegal search to the subject of the testimony (because automatic exclusion would perpetually disable a witness from testifying about relevant and material facts regardless of how unrelated these were to the purpose of the search and would be of little deterrence to illegal searches).

These tests may be restated in terms of: (1) Directness: how direct was the relationship between the search and the ultimate testimony?; (2) Attenuation: is the causal relationship weakened by facts showing that the witness's voluntary detached reflection and other circumstances occurring after the search played a significant part in inducing the witness to testify?; (3) Inhibitory Effect: would exclusion of the testimony tend to deter unconstitutional police misconduct?

Here, each test points to the same result; all weights must be placed on the "suppress" side of the balance. The witnesses were initially questioned at the very scene of arrest and detained only as a result of the illegal stop. They were detained until the trial, and their testimony can hardly be said to be either voluntary or the result of detached reflection. They were discovered as a result of a search having no purpose other than their discovery and apprehension. Finally, the exclusion of their testimony is likely to deter such searches in the future. The *Ceccolini* analysis commands the exclusion of the testimony indispensable to conviction.

For these reasons, the decision of the panel of this court dated September 16, 1977 and set forth at 559 F.2d 300 is vacated, and the conviction is REVERSED.

JOHN R. BROWN, Chief Judge, with whom AINSWORTH, Circuit Judge, joins except with that portion which approves the majority's "clearly erroneous holding," dissenting in part:

I join in the lamentations of Judge Gee save that I agree with the Court's "clearly erroneous" holding.[1] I do not find in *Ceccolini* express words which drive us to our Court's conclusion. Nor on proper restraints of stare decisis do I find that the High Court's rationale compels this result in the name of protecting the driver's freedom from intrusion.

The defendant was convicted not because of word testimony about what the officer saw or heard. He was convicted by what the aliens stated under oath as to what the defendant did in relation to them and their obviously illegal transportation.

Live swearers under severe cross-examination had the truth to tell. Not only do we suppress what the officer might testify to as to what he saw and heard, but we silence the knowing human beings who were not only witnesses, but victims.

A kidnapper having custody of the victim is stopped on the highway by officers who have neither probable cause nor any reason to suspect the identity of the driver. On stopping, the officers recognize the predicament of the victim, rescue him, and take the driver into custody.

On today's holding the victim's lips are sealed because his presence and identity were discovered by the illegal stop (seizure). I cannot believe that the Constitution com-

1. Except with respect to this holding, I join fully in Judge Tjoflat's dissent.

pels this or that the Supreme Court would so declare.

GEE, Circuit Judge, with whom AINSWORTH and VANCE, Circuit Judges, join, dissenting:

On March 9, 1978, because of disagreement on the court about the proper scope of the exclusionary rule, this cause was taken en banc. The question at issue was whether the rule should be extended to disqualify as witnesses people who were themselves found in the course of an illegal search, silenced because of the circumstances attending their discovery. To a majority of the panel—perhaps to all, since the dissent was on a different ground—it seemed that our circuit's opinions in *United States v. Allen,* 537 F.2d 1387 (1976), and *United States v. Breedlove,* 444 F.2d 422 (1971), bound us to the view that if the witness so discovered did not himself complain of the search, the defendant seeking to exclude his testimony lacked a sufficient proprietary or other interest in the witness or his testimony to have standing to exclude it. In *Breedlove,* for example, we had written:

> Even assuming, *arguendo,* the lack of probable cause for the arrest, appellants have no standing to challenge the invasion of another's rights. . . .
> Fourth amendment rights are personal rights which may not be vicariously asserted.

444 F.2d at 424. Admittedly, as the panel opinion noted, there were authorities, or at least expressions, in our circuit tending the other way. *See* cases cited at note 6, *United States v. Cruz,* 559 F.2d 300, 303 (5th Cir. 1977).

On March 21, 1978, the Supreme Court rendered its opinion in *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). That opinion superseded our prior authorities on the subject, requiring their re-examination. This the majority opinion undertakes to do, restating

the *Ceccolini* criteria rather freely and, in my view, somewhat tendentiously. With deference, the opinion also seems to me to overwrite the record facts seriously in one respect in order to supply a basis for its conclusion that the aliens' testimony was not freely given. First, it remarks that they "were presumably kept in custody,"[1] a matter as to which the record is silent. A little later, gaining confidence from its earlier speculation, it avows, "*They were detained until the trial,* and their testimony can hardly be said to be either voluntary or the result of detached reflection."[2]

It is doubtful that *Ceccolini* requires the result reached by the majority. If it does—and whether it does or not, since the majority opinion is now the law of the circuit—I think the result unwise, basically for the commonsense reasons put forward by the dissent of Chief Judge Brown. Nor can I forbear expressing a regret that criminal trials in our circuit, already so freighted with issues collateral to guilt or innocence, are now called upon to accommodate yet one more inquiry irrelevant to their *raison d'etre*—another which seeks to punish the policeman by turning the criminal[3] loose again on the public.

Nor, for the reasons stated in the panel opinion, can I agree that the court below was clearly erroneous in ruling that the search of Cruz' automobile was not a pretext. It is true that Deputy Muldraw testified that he first turned back to see if he could render assistance to a car he had passed which was travelling on the highway shoulder, with a right-turn indicator flashing, when it did not follow him over a hill. I see nothing inherently incredible in this. He went on to swear that when he came back over the hill he saw that the car had reversed its direction, leading him to believe that it had turned across the hill's no-passing zone, and that he pursued it to issue a warning. Certainly, this was an action which might reasonably be thought to indicate no more than zealousness on his part.

1. Majority op. p. 542.

2. Majority op. p. 543 (emphasis added).

3. And there is no doubt here that Cruz was an alien smuggler, the grave consequences of which activity the majority correctly notes.

And almost immediately upon stopping the car, he became aware that it contained suspicious-looking occupants. In view of this, it does not seem to me unusual that he ceased to be much concerned about a possible violation of the highway laws.

Yet from our court's discussion, I gather that if Muldraw had gone ahead to give Cruz a ticket or warning ticket, continuing to pursue the arguable traffic offense after observing a probable violation of national immigration laws, the result might have been different. Muldraw was a law-enforcement officer. He testified to his motives; the judge who heard his testimony and saw him testify believed him; and I do not think the other circumstances were so suspicious as inexorably to give him the lie. But the matter is close, and an extended controversy about factual matters is inappropriate here.

TJOFLAT, Circuit Judge, with whom BROWN, Chief Judge, joins, dissenting in part; AINSWORTH and VANCE join, dissenting:

The majority does serious violence today to both the longstanding and new-sprung precedent of this circuit. The opinion pays but unctuous observance to the venerable principles of appellate review, honoring them only in the breach. For these reasons I am compelled strongly to dissent.

The majority's reasoning cannot be reconciled with two cases decided by this court en banc but days ago. The court today invalidates a stop predicated upon a clear violation of the law because the majority is "left with the firm conviction that Deputy Muldraw was hunting for illegal aliens and stopped Rhodes's automobile in order to inspect its occupants." *Ante* at 542. In *United States v. Edwards,* 577 F.2d 883 (5th Cir. 1978) (en banc), decided on August 1, we upheld a stop and arrest for violation of traffic laws even though the officers had all but probable cause to arrest the defendant for possessing items stolen from the mails. The en banc court went on to approve a search of the automobile uncovering checks stolen from the mails because the search was incident to the lawful arrest. *United States v. Warren,* 578 F.2d 1058 (5th Cir. 1978) (en banc), decided August 24, held valid the seizure, boarding, and search of an American vessel by the Coast Guard and Agents of the Drug Enforcement Agency and Customs Service. We reached this result in spite of the admission by the Customs and DEA agents that one of their purposes in accompanying the Coast Guard was to look for obvious customs and narcotics violations. *Id.* at 1065.

But the proposition that ulterior motives will not ordinarily vitiate an otherwise lawful stop or arrest is not a new one in this circuit. Ten years ago this court decided *Amador-Gonzalez v. United States,* 391 F.2d 308 (5th Cir. 1968), an opinion relied upon by the majority in invalidating the stop in this case. *Ante* at 539, 541. The court in *Amador-Gonzalez,* however, expressly indicated that the arrest, which was for a traffic violation, was sound. Judge Wisdom, writing for the court, stated, "Here the arrest was valid. *The pretextual motivation did not vitiate the validity of the arrest;* Gonzalez admittedly violated local traffic laws. The question before us is the validity of a search made after a lawful arrest for a traffic offense." *Id.* at 315 (emphasis supplied).

*Edwards, Warren,* and *Amador-Gonzalez* stand firmly for the proposition that the ulterior motivations of the officer will not ordinarily void an otherwise legal stop or arrest.[1] These motivations come into play

---

1. Under egregious circumstances, it may well be that a stop or arrest is invalid because of the officer's improper motivations. But such circumstances are rare, and quite dissimilar from the case at hand. Consider, for example, the case of *Taglavore v. United States,* 291 F.2d 262 (9th Cir. 1961). Officers suspected that the defendant possessed narcotics. A warrant was issued for his arrest—not for narcotics violations but for minor traffic infractions an officer claimed to have observed the night before. The defendant was arrested and taken into custody for the traffic violations (an unordinary procedure), and after a struggle portions of a marijuana cigarette were forcibly removed from his mouth. The court invalidated the search because the arrest "is only a sham or a front being used as an excuse for making a search." *Id.* at 265; *see Henderson v. United States,* 12 F.2d 528 (4th Cir. 1926).

in determining whether the search following the stop or arrest is truly incident thereto. "Proof that a traffic arrest was only a pretext to search for evidence of another offense is significant legally only because it bears on the reasonableness of the search." *Amador-Gonzalez,* 391 F.2d at 215. But the majority today knocks out the testimony of the occupants of the automobile because the *stop* is held invalid.

It is not difficult to discern why the majority adopts such an anomalous and unprecedented approach; if the stop was valid, as it obviously was here because a traffic violation had occurred, the testimony of the occupants cannot be the fruit of an illegal search because there was no search. The aliens were visible when Deputy Muldraw made the stop. Their nervousness and suspicious appearance fully justified further inquiry. *Warren,* 578 F.2d at 1065; *cf. United States v. Barnard,* 553 F.2d 389 (5th Cir. 1977) (nervousness of occupant a factor justifying border patrol stop). That inquiry led immediately to the discovery that the occupants were in fact illegal aliens.

All that I have said so far holds even if we accept the majority's finding that Deputy Muldraw was merely "hunting for illegal aliens" when he made the stop. Motivation is generally irrelevant in determining whether the stop is valid. On this record, however, I am convinced that the majority is wholly unwarranted in making such a determination. In my view, the majority pays but lip service to the principles of appellate review and goes on to engage in the most egregious form of appellate fact finding.

The district court denied the defendant's motion to suppress on the basis of Deputy Muldraw's testimony. He stated that after he had passed Cruz's car, which was moving slowly on the shoulder of the road, he stopped and returned to see if the automobile was in trouble. When he could view the automobile again, it was apparent that the car had made an illegal U–turn. He pursued and stopped the defendant to issue a warning. The majority chooses to disregard this testimony, based on the "firm conviction" that "Deputy Muldraw stopped the Pontiac for the sole purpose of searching for aliens." *Ante* at 541. Emphasis is placed on the failure of Deputy Muldraw actually to issue a warning or carry out an arrest for the traffic violation. *Id.* at 540. This circumstance is of little significance; it does not strain the imagination that the Deputy neglected to act on the traffic violation when it became apparent upon the stop of the car that much more grievous violations of the law had occurred.

The majority notes but then ignores the inveterate doctrine that an appellate court will not disturb the findings of fact of the trial court unless they are found to be clearly erroneous. Here, as the majority opinion points out, the district court denied the motion to suppress without making specific findings. *Id.* at 539 n. 4. Even where findings are not made, "we uphold the ruling of the Trial Court if there is any reasonable view of the evidence to support it." *United States v. Montos,* 421 F.2d 215, 219 n. 1 (5th Cir. 1970). Applying this principle to Cruz's case and bearing in mind that credibility choices lie at the core of the rule of appellate deference, I find the majority's result untenable. "It is not our task to re-try the facts of the case; this is especially true where the lower court's findings are based on oral testimony and the trial judge has viewed the demeanor and judged the credibility of the witnesses." *Franks v. National Dairy Products Corp.,* 414 F.2d 682, 685 (5th Cir. 1969); *see United States v. Kaiser,* 545 F.2d 467, 476–77 (5th Cir. 1977); *United States v. Jackson,* 352 F.2d 490, 491 (5th Cir. 1965).

The court below obviously believed Deputy Muldraw's story. The story is hardly unreasonable. An officer passes a vehicle that is in apparent distress. He continues over a hill, and after driving some distance realizes that the car has not followed. He returns to render assistance, but discovers that the driver of the car has violated traffic laws. He performs his duty and stops

the vehicle to issue a warning, and at this time he discovers illegal aliens sitting in the back seat. What else would the majority have this officer do? Pass by a traveler in distress? Ignore violations of the law?

I believe that the majority has substantially rewritten the law of this circuit without warrant. But perhaps the more grievous transgression is that the court has lost sight of its role as an appellate tribunal. I must, therefore, dissent.