**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Charles Gilbert HARDY and Buddy
Huffman, Jr.,
Defendants-Appellants.**

**No. 87–8855.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 19, 1988.

Rehearing and Rehearing En Banc Denied
Nov. 4, 1988.

John Nuckolls, Atlanta, Ga., for defendants-appellants.

Nicolette S. Templer, Julie E. Carnes, Asst. U.S. Attys., Atlanta, Ga., for plaintiff-appellee.

Before HILL and KRAVITCH,
Circuit Judges, and TUTTLE, Senior
Circuit Judge.

KRAVITCH, Circuit Judge:

Appellants Charles Gilbert Hardy and Buddy Huffman were each indicted on one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841, one count of possession with intent to distribute marijuana, also in violation of 21 U.S.C. § 841, and one count of conspiracy to possess cocaine and marijuana with intent to distribute, in violation of 21 U.S.C. § 846. After holding an evidentiary hearing on the circumstances of appellants' detention by a Georgia state trooper, a magistrate concluded that the seizure of contraband in appellants' possession did not violate the fourth amendment and recommended that the narcotics found as a result of that seizure not be suppressed. The district court adopted the magistrate's report and recommendation. Pursuant to Fed.R.Crim.P. 11(a)(2), appellants, with the consent of the district court and the government, entered conditional pleas of guilty and preserved their rights to appeal the suppression order. They now appeal that ruling, and we affirm.

## I.

On the evening of January 30, 1987, Trooper Michael Ralston of the Georgia State Patrol was investigating an accident on Interstate Highway 75 in northwestern Georgia when he observed a speeding northbound automobile. After completing his investigation of the accident, Ralston pursued the speeding car and eventually overtook a Lincoln Town Car that was passing several other vehicles. Ralston determined by use of radar that the Town Car was traveling at 67 miles per hour in a zone with a speed limit of 55 miles per hour. At approximately 8:57 p.m., Ralston turned on the blue light of his patrol car and pulled the Town Car to the side of the road.

Ralston asked the driver of the Town Car (Huffman) to produce a driver's license and vehicle registration. Huffman was unable to provide a driver's license or any other form of identification. Huffman told Ralston that he had lost his wallet and driver's license while on vacation in Florida. Huffman further said that he and the passenger of the car (Hardy) had spent a couple of weeks in Fort Myers, Florida, that they had been fishing, and that they had stayed with friends in Fort Myers. Huffman advised

Ralston that the car belonged to the passenger, whom Huffman knew only as "Charles" or "Charlie" and whose surname Huffman did not know.

Ralston then approached Hardy for the vehicle registration, which Hardy provided. The car was registered and titled to Hardy's wife Karen, of Elkhart, Indiana. In response to Ralston's questions, Hardy stated that the two had been to Fort Myers for four days and that they had stayed in a trailer owned by Hardy.[1] Hardy also told Ralston that he knew Huffman only as "Buddy" and did not know Huffman's surname.

The initial questioning of Huffman and Hardy lasted approximately fifteen minutes. Ralston returned to his patrol car and ran a computer check to determine whether Huffman's driver's license was valid and whether Huffman was wanted for any crimes. After approximately ten minutes, Ralston learned that Huffman possessed a valid license and was not wanted. Ralston nonetheless remained suspicious about the men, due to their inability to identify each other's surnames, the inconsistencies between their accounts of the fishing vacation, and Huffman's lack of identification. As he exited his patrol car, Ralston activated a video camera mounted on his dashboard.

Ralston gave Huffman a warning for the speeding offense and returned the vehicle registration to Hardy. Ralston asked Hardy whether he would consent to a search of the automobile. Hardy initially acceded to this request but withdrew his permission after reading a printed consent form provided by Ralston. Ralston next approached Huffman for consent to search the vehicle. Huffman seemed willing to give his permission to search the car, or at least his own suitcase in the trunk.[2] After further discussion, however, Ralston concluded that Huffman lacked authority to grant consent to search over Hardy's objection. His suspicions not dispelled, Ralston informed the men that he was detaining them on the highway until he could obtain a narcotics dog to "sniff" the car and run a more extensive computer check on persons wanted for drug offenses through a Drug Enforcement Administration clearinghouse.

Ralston radioed the Sheriff's Department of Murray County, Georgia, to request a narcotics dog. Sergeant Peggy Cloer, the dispatcher, punched a time card indicating that the call was received at 9:34 p.m. Cloer called Leroy Green, the handler of the narcotics dog, who was attending a high school basketball game 20 to 30 miles from where Huffman and Hardy were being detained. Green left immediately and, after retrieving the most accessible trained dog, drove to the site of the stop. He radioed the Sheriff's Department upon his arrival at 10:11 p.m. Cloer again acknowledged the communication by punching a time card.

1. On direct examination, Ralston testified that Huffman told him that "he" had stayed with friends in Florida, R3–34. Counsel for the government subsequently asked, "Where did Mr. Huffman say *they* had stayed?" Ralston replied "At friends." Government counsel further asked Ralston, "And where did Mr. Hardy say *they* had stayed?" Ralston answered, "He advised that he had a trailer in Fort ·Myers [sic]." R3–37.

On cross-examination, Ralston admitted that he was not absolutely certain whether he asked Hardy "where did you all stay or where did you stay" and consequently could not "say precisely whether [Hardy] was answering a question as to whether they stayed or whether one of them stayed." Defense counsel stressed this point at the suppression hearing, arguing that there was not necessarily any inconsistency between the two men's accounts of where they had stayed in Fort Myers, and that further questioning by Ralston might have revealed that Huffman had stayed with friends but Hardy had stayed at the trailer.

The magistrate found that "Huffman stated that ... they had stayed with 'friends'", whereas "[Hardy] stated that they had stayed in a trailer owned by him." We interpret these sentences as a factual determination that both men told Ralston that they had stayed together in Fort Myers, but that the two men gave different places as the location of their stay. This finding is not clearly erroneous. Furthermore, even if the two men's stories could have been harmonized on this point, there were other inconsistencies in their stories and gaps in their knowledge of each other sufficient to give Ralston a reasonable suspicion of narcotics trafficking.

2. The videotape is unclear on this point.

Green's dog alerted to the presence of narcotics in the car's trunk. Concluding that he now had the right to search the car without Hardy's consent, Ralston opened the trunk by pushing the electronic release button in the dashboard. In the trunk Ralston found a small suitcase and a small blue travel bag; inside the blue bag were three plastic bags containing a substance that Ralston believed to be marijuana. Ralston formally arrested Huffman and Hardy and placed them in the patrol car. A further search of the car revealed a brown paper bag containing three kilograms of a substance resembling cocaine, another paper bag containing $2,000.00 in cash, and a long butcher knife.

## II.

■ We first consider whether Ralston was justified in stopping the Town Car for speeding.[3] Appellants argue that Ralston's traffic stop was a mere pretext for the investigation, without reasonable suspicion, of narcotics offenses. As we have stated numerous times, the proper inquiry for determining whether a stop is pretextual is "whether a reasonable officer *would* have made the seizure in the absence of illegitimate motivation." *United States v. Smith*, 799 F.2d 704, 708 (11th Cir.1986); *accord United States v. Bates*, 840 F.2d 858, 860, 1988 WL 18,329 (11th Cir.1988); *United States v. Miller*, 821 F.2d 546, 549

**3.** The government argues that Huffman lacks standing to contest the search of the automobile, or, in the alternative, that Huffman abandoned any privacy interest he had in the contents of the car by inviting Ralston to search the trunk. The magistrate agreed with the government's argument on both points. Given that the substantive issues concerning the reasonableness of the detention are identical as to both appellants, and that our resolution of those issues compels affirmance of the district court's decision not to suppress the evidence, we decline to address the standing and abandonment arguments.

**4.** In *Smith*, we relied on *United States v. Cruz*, 581 F.2d 535 (5th Cir.1978) (en banc). *Cruz* held that a "traffic stop" purportedly made to give a citation for an illegal U-turn was a mere pretext for "hunting for illegal aliens" without reasonable suspicion. *See id.* at 542. The new Fifth Circuit abandoned *Cruz* in *United States v. Causey*, 834 F.2d 1179, 1987 WL 23,392 (5th Cir.1987) (en banc), but *Cruz* remains binding

(11th Cir.1987).[4]

There is no doubt that when Ralston pulled the Town Car to the side of the road, he had probable cause to believe that the driver of the vehicle had violated a Georgia traffic law. To support their claim that the stop was nonetheless pretextual, appellants place chief reliance on Trooper Ralston's participation in "Operation Nighthawk," a program involving the deployment of Georgia state troopers along interstate highways to interdict persons transporting narcotics from Florida to northeastern metropolitan areas. At the suppression hearing, appellants introduced a memorandum by the Commissioner of the Georgia State Patrol stating that state troopers involved in Operation Nighthawk would be used for "specifically targeting narcotics 'mules' traveling through Georgia to and from Florida," would be deployed "during peak drug traffic hours," and would "concentrate on northbound traffic, [remaining] on the interstate as much as possible." According to appellants, this memorandum proves that the Georgia State Patrol largely abandoned its role of enforcing traffic laws and converted to a drug investigation force. The memorandum states, for example, that "'Nighthawk' patrols will not investigate accidents, unless a major collision on an interstate highway requires their assistance."[5]

authority in this circuit under *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**5.** Ralston's testimony tended to contradict the impression of Operation Nighthawk that one might obtain from reading this memorandum. Ralston testified, for example, that Nighthawk was just a "philosophy" of heightened awareness about drug trafficking; that "while [a trooper is] out on normal patrol, ... if they ran across a vehicle that they had suspicions to believe that possibly had narcotics, after they have stopped the vehicle for a traffic stop then the officer would be more apt to particularly pick up on the things that he would need to pick up on." R3–74–75. Ralston further testified that "we have a particular policy that no vehicle will be stopped solely based on a suspicion that the vehicle is carrying contraband." R3–149. In short, Ralston described Operation Nighthawk as merely heightened awareness and understanding of the use of interstate highways for

The crucial defect in appellants' argument is that Operation Nighthawk expired before the date of their arrest. Ralston testified that the special deployment of Nighthawk patrols on the interstate highways ended in October or November of 1986, and this testimony was not rebutted. Ralston admitted on cross-examination that "the philosophy" of Operation Nighthawk remained, but according to Ralston's testimony, this "philosophy" meant no more than troopers being "aware of what was occurring [i.e., drug trafficking]." R3–83. There is no constitutional violation in peace officers simply having an increased understanding of circumstances suggesting criminal activity; like other professionals, state troopers must be trained.[6] As our predecessor court stated, "if the initial stop was legal, the [officer] had the duty to investigate suspicious circumstances that then came to his attention." *United States v. Cruz*, 581 F.2d 535, 539 (5th Cir.1978) (en banc).

Ralston's testimony established that his decision to stop the Town Car was made as part of a routine traffic investigation. Ralston had not spent the day lying in wait for northbound cars from Florida. *Cf. United States v. Miller*, 821 F.2d at 547 (state trooper parked perpendicular to northbound lanes, with headlights illuminating occupants of passing vehicles). Ralston left the State Patrol post at 8:00 p.m. to investigate a traffic incident—a duty that, indeed, was incompatible with the provisions of Operation Nighthawk. He decided to pursue the Town Car only after he observed it speeding. He engaged his blue light after he saw the Town Car pass numerous other vehicles and after he determined, by reference to his radar unit, that the Town Car was exceeding the speed limit. A "drug courier profile" played no role in this calculus. Until the Town Car stopped, Ralston did not know the state in which the car was registered or the sex and age of the occupants. *Cf. United States v. Smith*, 799 F.2d at 706 (state trooper decided to pursue vehicle only after he observed that car was occupied by two young males). We therefore agree with the magistrate that "there is no credible evidence that the stop of the defendants' car was pretextual."

### III.

At approximately 9:25 p.m., Ralston gave Huffman a warning for the speeding offense, ending the investigation of the traffic violation. The next few minutes were occupied by Ralston's attempt to secure consent to search the car from either Hardy or Huffman, by Hardy's initial grant and subsequent withdrawal of consent, and by consultation between the two appellants. Upon concluding that consent was not forthcoming, Ralston informed the appellants at approximately 9:34 p.m. that he would detain them pending the arrival of a narcotics dog. In our view, an investigative "stop" of appellants began at 9:34 p.m.[7] We address whether Ralston was justified at that point in detaining appellants.

drug trafficking rather than a full-scale redeployment of the Georgia State Patrol for purposes of drug interdiction.

The district court did not resolve the apparent conflict between Ralston's testimony and the Commissioner's memorandum. We find it unnecessary to resolve the conflict as well, because we conclude that Ralston's decision to stop appellants was not undertaken as part of Operation Nighthawk.

6. Appellants do not suggest that state troopers, as such, are constitutionally prohibited from investigating criminal activity. The Georgia Code provides that state troopers "shall prevent, detect, and investigate violations of the criminal laws of this state, any other state, or the United States which are committed upon [the] public roads and highways or upon property appertaining thereto and shall apprehend and arrest those persons who violate such criminal laws." O.C.G.A. § 35–2–32(b).

7. We have reviewed the videotape and are persuaded that Ralston's brief attempt to secure consent to search the automobile was entirely noncoercive. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968); *accord Florida v. Rodriguez*, 469 U.S. 1, 5–6, 105 S.Ct. 308, 310–11, 83 L.Ed.2d 165 (1984) (per curiam); *United States v. Espinosa-Guerra*, 805 F.2d 1502, 1507 (11th Cir.1986).

The reasonableness of Ralston's decision to detain the appellants is governed by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. The officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts," *id.* at 21, 88 S.Ct. at 1880, justify a "reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam). We have little difficulty concluding that the decision to detain appellants was valid under *Terry*.

This is not a "drug courier profile" case. In making the decision to detain appellants, Ralston did not rely solely on "personal characteristics shared by drug couriers and the public at large, ... without any indication that those [characteristics describe persons] predominantly, or even mainly, engaged in an ongoing crime." *United States v. Sokolow*, 831 F.2d 1413, 1420 (9th Cir.1987), *cert. granted*, ─── U.S. ───, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988).[8] True, Ralston knew that Huffman and Hardy were males of apparently different ages and "lifestyles" traveling north from Florida, but he also knew a great deal more than that. He knew that Huffman claimed that the two had taken a two-week vacation and had stayed with friends whereas Hardy said that they had been in Fort Myers for only four days and had stayed in Har-

dy's trailer. He also knew that neither Huffman nor Hardy knew the other's last name, a circumstance that quite reasonably raised in Ralston's mind a suspicion that the two men had not taken a vacation in Florida but had come together for a brief, illegal business transaction.[9] Finally, Ralston knew that Huffman was unable to give a satisfactory account of Hardy's line of work. The videotape reveals that Ralston asked Huffman about Hardy's occupation immediately after giving Huffman the warning ticket. Huffman replied that Hardy was retired, or that he "had money," or that he owned a bar, or that he ran a factory. For two friends who supposedly had taken a fishing trip to Florida together, Hardy and Huffman knew remarkably little about each other. The gaps and inconsistencies observed by Ralston created a reasonable suspicion justifying the investigative stop.

## IV.

We consider finally whether the investigative detention of appellants was sufficiently limited in scope and duration to remain within the bounds permitted by *Terry v. Ohio* and not ripen into a full-scale arrest unsupported by probable cause. Consideration of this issue requires reference to a line of Supreme Court cases culminating in *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), and to our own decision in *United*

---

8. As the government notes, we have never held that the use of a "drug courier profile" is *per se* unconstitutional. We have stated, however, that "a match between certain characteristics listed on the profile and characteristics exhibited by a defendant does not automatically establish reasonable suspicion." *United States v. Berry*, 670 F.2d 583, 600 (5th Cir. Unit B 1982) (en banc) (binding authority under *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982)); *see also Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). Moreover, we held in *Smith* that certain innocuous characteristics such as traveling from Florida and operating a car with an abundance of caution, even in combination, could not support a reasonable suspicion of criminal activity. *See United States v. Smith*, 799 F.2d at 708 n. 5. A useful contrast to *Smith* is *United States v. Espinosa-Guerra*, 805 F.2d 1502 (11th Cir.1986). In *Espinosa-Guerra*, a federal agent learned the name under

which the defendant was traveling and the telephone number that the defendant had given to the airline as his home number, called the telephone number, and discovered that no one at that number had any knowledge of anyone by the name that the defendant had used to make the reservation. *Id.* at 1508. This investigation gave the agent a reasonable suspicion that the defendant was traveling under an alias.

9. Ralston testified that drug couriers who are apprehended while traveling together frequently do not know each other's names. R3–179. At the suppression hearing, counsel for appellant suggested that Hardy and Huffman did not reveal each other's last names to Ralston because they thought they were making only idle conversation with Ralston and did not understand that failure to reveal the surnames would be significant. The magistrate did not comment on this argument, but we view it as implausible.

*States v. Espinosa-Guerra,* 805 F.2d 1502 (11th Cir.1986).

*Sharpe* teaches that in distinguishing a true investigative stop from a *de facto* arrest, we must not adhere to "rigid time limitations" or "bright line rules," 470 U.S. at 685, 105 S.Ct. at 1575, but must use "common sense and ordinary human experience." *Id.; accord United States v. Place,* 462 U.S. 696, 709, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983) (declining to adopt "outside time limitation" for permissible *Terry* stop). Several issues and circumstances are deemed relevant to the analysis, including the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention. *See Sharpe,* 470 U.S. at 685–86, 105 S.Ct. at 1575; *Espinosa-Guerra,* 805 F.2d at 1510; *see also United States v. Alpert,* 816 F.2d 958, 964 (4th Cir.1987) (relying on similar list of factors).

Turning first to the law enforcement purposes served by the detention of appellants, the most important factor is whether the police detained appellants to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference. *See Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575. A *Terry* stop is justified to give the police an opportunity to engage in brief and non-intrusive investigation techniques, such as noncustodial questioning of the detained person. *See id.* (suspect was detained for

20 minutes so he could be questioned by more experienced drug enforcement agent). A *Terry* stop cannot be used as the basis of a "full search" that would normally be warranted only by the existence of probable cause, consent, or a valid arrest. *See United States v. Place,* 462 U.S. at 706, 103 S.Ct. at 2644; *Florida v. Royer,* 460 U.S. 491, 499, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion). Nor may the police use an investigative stop to subject a suspect to custodial interrogation that would ordinarily require formal arrest and *Miranda* warnings. *See Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed. 2d 824 (1979).

The canine sniff ordered in this case is the kind of brief, minimally intrusive investigation technique that may justify a *Terry* stop. As the Supreme Court noted in *Place,* a canine sniff does not require the opening of luggage and does not reveal intimate but noncontraband items to public view. "[T]he manner in which information is obtained through this investigative technique is much less intrusive than a typical search." *Place,* 462 U.S. at 707, 103 S.Ct. at 2644; *see also Florida v. Royer,* 460 U.S. at 505–06, 103 S.Ct. at 1328–29 (suggesting that police questioning of suspect may not be justified under circumstances where canine sniff would confirm or dispel suspicions). Nor does a canine sniff involve the time-consuming disassembly of luggage or an automobile frequently required in a thorough search for contraband.[10]

The second factor in the *Sharpe* calculus, the diligence of the police in pursuing the

---

**10.** In *United States v. Thomas,* 757 F.2d 1359, 1366–67 (2d Cir.), *cert. denied in pertinent part sub nom., Wheelings v. United States,* 474 U.S. 819, 106 S.Ct. 67, 88 L.Ed.2d 54 (1985), the Second Circuit held that the police could not conduct a canine sniff of the outside of a suspect's residence without a search warrant and probable cause. The *Thomas* court distinguished *Place* by noting that the canine sniff in *Place* occurred in an airport, whereas in *Thomas* the police were attempting to obtain information about material secreted within a suspect's home. "[T]he defendant had a legitimate expectation that the contents of his closed apartment would remain private, that they could not be 'sensed' from outside his door. Use of the trained dog impermissibly intruded on that legitimate expectation." *Id.* at 1367.

Assuming without deciding that the *Thomas* decision is correct, we view the canine sniff of the automobile in this case as more like the sniff approved in *Place* than the one condemned in *Thomas*. *Thomas* involved an attempt to intrude on the privacy of the home, where fourth amendment protections are at their peak. *See Payton v. New York,* 445 U.S. 573, 589, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The legitimate expectation of privacy that society recognizes in the contents of an automobile is significantly less than that attending a home or office. *South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976). Even if one has a greater expectation of privacy in the contents of an automobile trunk than in luggage carried through an airport, a highly debatable point, a canine sniff of a car is "mini-

investigation, is not in serious dispute here. Ralston radioed to the Murray County Sheriff's Office immediately upon deciding that a canine sniff was appropriate; Cloer immediately contacted Leroy Green; Green immediately retrieved the narcotics dog and proceeded to the site of the stop. This case is not like *Place*, where the federal agents knew in advance when Place would be arriving in New York but made no arrangements to meet him with a narcotics dog. The Georgia State Patrol could not have anticipated appellants' journey, and appellants make no suggestion that every state trooper must be accompanied by a narcotics dog. The state patrol did have a trained dog available within twenty-five miles, a distance we find sufficiently short given the rural nature of the area. *Cf. United States v. Borys*, 766 F.2d 304, 314 (7th Cir.1985) (DEA agents required to have narcotics dog "readily available," not "immediately available"), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986); *United States v. West*, 731 F.2d 90, 92 (1st Cir.1984) (DEA agents not required to "have a dog waiting near the gate whenever a sniff test of a known suspect's baggage is either probable or possible"), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 956, 83 L.Ed.2d 963 (1985).

We consider next the actual scope and intensity of the intrusion. Although appellants have attempted to portray the conditions of their detention as virtually the equivalent of custodial arrest, the videotape establishes that this was not the case.

Appellants were not removed to an office or a police station, a factor that the Supreme Court and this court have found significant in distinguishing *Terry* stops from custodial arrests. *See Florida v. Royer*, 460 U.S. at 502–03, 103 S.Ct. at 1326–27; *Dunaway v. New York*, 442 U.S. at 212, 99 S.Ct. at 2256; *United States v. Espinosa-Guerra*, 805 F.2d at 1509; *United States v. Berry*, 670 F.2d 583, 602 (5th Cir. Unit B 1982) (en banc). Ralston did not question the appellants during the waiting period, nor did he place them in the back of the patrol car or insist that they remain outside.[11] Hardy and Huffman spent the entire period between Ralston's radio call and the arrival of the narcotics dog waiting in their own car, and Ralston did not remove the keys.[12] The videotape does not establish conclusively whether appellants ran the engine and heat in their car, but they were certainly more comfortable than they would have been had Ralston detained them in the police car or kept them out in the cold. Appellants were also able to speak with each other freely and privately, a liberty that would have been absent had they been under *de facto* arrest.

Appellants urge that Ralston's refusal to allow them to wait in the nearest restaurant off the highway until the dog arrived was unreasonable and indicates that the detention was intrusive. We disagree. Appellants might have escaped had Ralston permitted them to drive to the restaurant in their own car. On the other hand, had Ralston driven them to a restaurant in his

---

mally intrusive" within the meaning of cases such as *Place.*.

**11.** We realize that in *Place* the Supreme Court stated that prolonged detention of a traveler's luggage can lead to a *de facto* arrest of the traveler without probable cause, even if the suspect is not "subjected to the coercive atmosphere of a custodial confinement or to the public indignity of being personally detained." 462 U.S. at 709, 103 S.Ct. at 2645. Other factors led the *Place* Court to conclude that an arrest had taken place, namely the 90–minute detention of Place's luggage, a longer period than the detention in this case, and the unreasonable lack of diligence that the federal agents displayed in investigating Place, a factor not present in this case. From cases such as *Dunaway* and *Berry*, it is clear that the conditions of the detention are relevant to determining whether an arrest has taken place.

**12.** Several cases have indicated that retention of a suspect's airline ticket by the police is a relevant factor in determining whether a *Terry* stop ripened into an arrest. *See, e.g., Florida v. Royer*, 460 U.S. at 502, 103 S.Ct. at 1326 (plurality opinion); *United States v. Mendenhall*, 446 U.S. 544, 548, 555, 100 S.Ct. 1870, 1874, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J., joined by Rehnquist, J.); *United States v. Lopez-Pages*, 767 F.2d 776, 779–80 (11th Cir.1985); *United States v. Elsoffer*, 671 F.2d 1294, 1297 (11th Cir.1982). We do not suggest, however, that appellants were free to leave simply because Ralston did not take the keys. The government has conceded that appellants were not free to leave once Ralston told Hardy that he intended to summon a narcotics dog.

patrol car, he might well have converted the *Terry* stop into an arrest requiring probable cause and *Miranda* warnings. Permitting appellants to proceed to a restaurant might also have extended the stop even further.

Finally, we address the length of the detention. Even after *Sharpe*, the duration of the stop remains an important factor, *see Sharpe*, 470 U.S. at 685, 686, 105 S.Ct. at 1575, and we bear in mind the Supreme Court's admonition prior to *Sharpe* that 90 minutes is probably too long for a *Terry* stop. *See Place*, 462 U.S. at 709, 103 S.Ct. at 2645 ("The length of the detention alone precludes the conclusion that the seizure was reasonable in the absence of probable cause"). The investigative stop in this case lasted approximately fifty minutes, from about 9:34 p.m., when Ralston informed appellants that they would be detained for a narcotics sniff, until about 10:25 p.m., when the narcotics dog alerted to the presence of drugs in the trunk.[13]

We confess to some unease on encountering a *Terry* stop lasting as long as fifty minutes. *Cf. United States v. Borys*, 766 F.2d at 313 (75–minute detention was "at the outer bounds of the Constitution"); American Law Institute, Model Code of Pre-Arraignment Procedure § 110.2(1) (1975) (suggesting twenty minutes as maximum duration for *Terry* stop). On the facts of this case, however, we cannot say the length of the stop, by itself, invalidated the detention. The duration of the stop is, in fact, the only significantly troubling circumstance in this case. In view of other aspects to the stop demonstrating that the police acted with propriety, particularly Ralston's circumspection in avoiding any questioning of appellants during the waiting period [14] and the expedition with which the police arranged for a narcotics dog, the doubts raised by the length of the detention are not sufficient for us to find that the stop violated the fourth amendment.

This case is less troubling than *United States v. Alpert*, 816 F.2d 958 (4th Cir. 1987), which also involved a fifty-minute detention.[15] In *Alpert*, the police removed the suspect's luggage from Charlotte Airport for a canine sniff at the police academy fifteen minutes away, even though they had been conducting surveillance of passengers arriving in Charlotte from Miami and could well have anticipated that they would have to detain a passenger's luggage. Trooper Ralston could not have known in advance precisely where or when he would encounter interstate highway drivers alerting his suspicions to narcotics trafficking, and the time spent in summoning a narcotics dog is more easily justified in this case. We therefore hold that the investigative detention of appellants did not exceed the permissible scope of a *Terry* stop.

Accordingly, the judgments of conviction are AFFIRMED.

HILL, Circuit Judge, specially concurring:

I concur in the result reached by the majority, but I do not fully agree with everything which is intimated by the majority in Part II of its opinion. Whether "Operation Nighthawk" was in effect or influenced Trooper Ralston has no bearing on this case. Ralston observed the speeding

---

**13.** We exclude the eight to ten minutes during which Ralston attempted to secure consent to search the car. The atmosphere during that period was not so coercive as to render the negotiations between Ralston and appellants a "seizure." *See supra* note 7.

Furthermore, we cannot entirely divorce the duration of the stop from the other conditions of the detention. Twenty minutes' detention out of doors on a North Carolina spring morning, *see Sharpe*, 470 U.S. at 677, 105 S.Ct. at 1570, may be less intrusive than twenty minutes spent under a broiling sun, in a police station, or in a small airport office. Although appellants have argued that the weather during the stop in this case was windy and cold, a contention amply borne out by the videotape, we have already noted that they spent most of the period in their car.

**14.** *Accord United States v. Borys*, 766 F.2d at 311 ("Continual interrogation for forty-five minutes would present a completely different picture from the sporadic questioning spanning three-quarters of an hour at issue here.").

**15.** The Fourth Circuit upheld the detention in *Alpert*. We do not express any opinion about what our conclusion would be on the facts of *Alpert*.

Town Car and made an entirely legal and constitutional stop because of its violation of a Georgia traffic law. Just because an officer is pleased that a suspicious car violates traffic laws so that a stop is justified does not make the stop unconstitutional. One who violates traffic laws is not, because he appears to be a drug courier, immunized from arrest.[1]

Moreover, if Georgia wants to use its highway patrol for no other purpose than to apprehend drug couriers, that is all right as long as it is done constitutionally. As noted in footnote 6 of the majority opinion, state troopers "shall ... investigate violations of the criminal laws of this state." O.C.G.A. § 35–2–32(b).

I agree with the sentence on page 17 of the majority opinion that the duration of the stop is the only troubling circumstance in this case. However, as the majority explains, in view of the other aspects of the stop demonstrating that the police acted with propriety, the duration of the stop alone does not violate the Constitution.

---

1. To the extent *United States v. Cruz,* 581 F.2d 535 (5th Cir.1978) (en banc) requires that a police officer have a "proper" motive as well as probable cause when stopping a car, I would suggest abandoning that position as the Fifth Circuit did in *United States v. Causey,* 834 F.2d 1179, 1987 WL 23,392 (5th Cir.1987) (en banc). As the *Causey* court noted, "so long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry." *Id.* at 1184.