UNITED STATES of America, Plaintiff-Appellant,

v.

Bobby Gene SIMMONS, Defendant-Appellee.

No. 98-2295.

United States Court of Appeals,

Eleventh Circuit.

April 14, 1999.

Appeal from the United States District Court for the Middle District of Florida. (No. 97-288-CR-T-26C), Richard A. Lazzara, Judge.

Before HATCHETT, Chief Judge, MARCUS, Circuit Judge, and KRAVITCH, Senior Circuit Judge.

MARCUS, Circuit Judge:

A federal grand jury indicted Bobby Gene Simmons on charges of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g), possession of cocaine with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1), and carrying a firearm during and in relation to a drug offense, in violation of 18 U.S.C. § 924(c)(1). Simmons moved to suppress some thirty bags of cocaine and a firearm, both of which police officers discovered in his automobile following a traffic stop for running a stop sign. After holding an evidentiary hearing, the district court suppressed both the gun and the cocaine as the fruits of a "prolonged" detention that violated the Fourth Amendment. The government has taken this interlocutory appeal from the suppression order, arguing that the relatively short additional delay occasioned by the officers' investigation during the traffic stop—attempting to verify whether the detainee was the "Bobby Simmons" who was the subject of an outstanding arrest warrant—was a valid detention under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[1] We agree and reverse.

---

[1]The government also argues that the police had reasonable suspicion of Simmons' involvement with the sale of cocaine based upon information the officers had received prior to the stop, and contends that Simmons' detention, until a drug-detecting dog could arrive, was reasonable on that basis too. Since we find that the delay while investigating the warrant provides a constitutional basis for Simmons' detention, we have no need to determine whether the officers had reasonable suspicions of Simmons' involvement with cocaine based upon information predating the traffic stop.

I.

The facts are straightforward and we recount them as they were found by the district court, crediting the officers' testimony. On June 9, 1997, at 6:14 p.m., Tampa Bay police officers Dale Frix and Alexander Rahmings stopped Bobby Gene Simmons for running a stop sign while driving a white Pontiac station wagon with dark-tinted windows.[2] Before approaching the stopped car, the officers advised their dispatcher that they were on a traffic stop. They told Simmons that he had been stopped for failing to stop at a stop sign and requested his driver's license and registration. They also asked for consent to search the car, but Simmons refused. Four minutes later, at 6:18 p.m., Officer Frix radioed the dispatcher and requested a drug-detecting dog, but was told that narcotics dogs usually were not available until 7:00 p.m. Approximately ten minutes later, Frix again radioed the dispatcher for an update on the availability of a dog. At 6:32 p.m., the dispatcher told Frix that there was still no dog available. Frix asked the dispatcher to contact a supervisor who might know where a canine unit could be located.

While Officer Frix sought a narcotics dog, Officer Rahmings had begun writing a traffic citation for Simmons. He also conducted a routine mobile computer check to ascertain whether there were any outstanding arrest warrants for Simmons. Rahmings learned that Simmons' license and registration were valid, but received a computer report of an outstanding arrest warrant from Brevard County, Florida, for a "Bobby Simmons" on a worthless check charge. The physical description of the subject of the warrant—black male, 5 feet 10 or 11 inches tall, weighing 200 pounds—closely matched that of Simmons, but the birth date was different. The arrest warrant listed the subject's date of birth as October 10, 1957, and

---

[2]Prior to the traffic stop, Officers Frix and Rahmings had received information from two sources implicating Simmons as a dealer in narcotics. Two and one-half months earlier, a person familiar with the Robles Park area, the neighborhood near where Simmons was detained, told the officers that a man who drove a white Pontiac station wagon with dark-tinted windows regularly sold drugs in the area. Three weeks before the stop, a woman who had been arrested for cocaine possession told the officers that she regularly bought cocaine from Simmons. She said that she would page Simmons from a nearby convenience store, and that Simmons usually appeared at the store shortly after being paged to call the telephone number of the convenience store.

Simmons' date of birth was August 23, 1953, making the subject of the warrant approximately 40 years old, while Simmons was approximately 44 years old.

Officer Rahmings radioed the dispatcher to request a teletype be sent to Brevard County to clarify the information, but was put on hold. Rahmings then used his mobile computer to request the teletype to be sent. Rahmings also tried to contact his supervisor for advice on how to proceed. Rahmings' activities occurred within 20 to 30 minutes of the officer's return to the police car to write the traffic citation, or between 6:38 p.m. and 6:48 p.m.

At 6:50 p.m., Officers Frix and Rahmings were notified that a drug-detecting dog had been dispatched to the scene. Six minutes later, Rahmings called his dispatcher to confirm that his request that a teletype be sent to Brevard County had been received, but again was told by the dispatcher to "stand by." At approximately 7:00 p.m., the drug-detecting dog arrived at the scene and gave a positive alert to Simmons' car for the presence of contraband between 7:05 p.m. and 7:10 p.m. Soon thereafter, the officers searched Simmons' car and found thirty small bags of cocaine under the driver's seat and a loaded handgun beneath a sheet of paper on the center console. By 7:12 p.m., Simmons was under arrest. At 7:32 p.m., Brevard County responded to the teletype inquiry, reporting that it had no further information on the "Bobby Simmons" who was the subject of the bad check warrant.

The district court unambiguously found that the police officers had observed Simmons run a stop sign and consequently ruled that the initial traffic stop was lawful, regardless of what the officers' subjective motivations may have been. Notably, the court also determined that the Tampa police officers had acted diligently in attempting to verify whether Simmons was the subject of the Brevard County arrest warrant and found that there had been no undue delay in that endeavor. Further, the court found that the police had acted

3

diligently in procuring a drug-detecting dog and that there had been no unreasonable delay in getting the dog to the scene.[3]

Notwithstanding those findings of fact and credibility choices drawn in favor of the police officers, the district court concluded that the detention of Simmons *beyond* the time it normally takes to write a traffic citation was unconstitutional because the officers lacked reasonable suspicion to believe that Simmons was the actual subject of the Brevard County arrest warrant. In addition to what the court regarded as ambiguous information concerning the warrant from the computer check, the court based its ruling on several factors it felt were peculiar to this case: that Simmons lived in the neighborhood where the stop had taken place on the west coast of Florida, and the warrant was issued from a county on the east coast of Florida; that the officers had known of their drug suspicions of Simmons for several months and yet had learned of no outstanding warrants for him; and that the officers easily could have arrested Simmons later if the warrant turned out to be for him. Having concluded that the officers lacked reasonable suspicion to detain Simmons based on the arrest warrant, the district court determined that evidence found by the police after the time Simmons' traffic stop normally should have been completed had been discovered in violation of the Fourth Amendment.[4]

## II.

We review the trial court's findings of fact for clear error, *see Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), but we review de novo the application of those facts to the law,

---

[3]The court rejected as not sufficiently specific the officers' testimony that they also had a reasonable suspicion that Simmons' dark-tinted windshield violated some tint law of Florida, but that ruling is not relevant to our conclusions on this appeal.

[4]The court phrased the issue as follows: "The issue is, is between 6:18 and we'll say 7:00 p.m., that's what, 42 minutes, 42 minutes, taking into account how long these police officers would normally write a ticket—really hasn't been any testimony, but obviously it doesn't take 42 minutes to effectuate a traffic stop for a stop sign—was that too long? Did they have the authority to detain Mr. Simmons awaiting the arrival of this K-9, this drug—I'll call it the drug dog, based on facts which came to their mind or which they perceived after the traffic stop?"

4

*see United States v. Garcia,* 890 F.2d 355, 358 (11th Cir.1989). Here, since the government is not contesting any factual finding, we apply the de novo standard.

Under the Fourth Amendment, a decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation occurred, *see Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), and an officer's motive in making the traffic stop does not invalidate what is otherwise "objectively justifiable behavior under the Fourth Amendment," *id.* at 812, 116 S.Ct. 1769; *see also United States v. Roy,* 869 F.2d 1427, 1431-33 (11th Cir.) (subjective belief of Coast Guard did not invalidate boarding, even where the officers themselves believed they did not have probable cause, where facts objectively supported a finding of probable cause, which is determined by the courts), *cert. denied,* 493 U.S. 818, 110 S.Ct. 72, 107 L.Ed.2d 38 (1989). The district court found that there was "no question" that the officers had observed Simmons run the stop sign and, therefore, had probable cause to stop Simmons' automobile. There is no basis on this record to question that finding, which was grounded upon credibility choices made by the district court.

The essential question posited by this case then is whether the additional 17 to 26 minutes consumed by Officer Rahmings' attempts to track down more information concerning the Brevard County warrant for a bad check charge rendered the duration of the stop unconstitutional. We hold that it did not. Once the police had validly detained Simmons, plainly they were entitled under the decisional law to conduct a variety of checks on the driver and his car, including questioning the driver about the traffic violation, requesting consent to search the car, *and* running a computer check for outstanding warrants. *See, e.g., Ohio v. Robinette,* 519 U.S. 33, 35-36, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (discussing an officer's computer check of driver license and request for consent to search during a traffic stop); *United States v. Hardy,* 855 F.2d 753, 755, 757 (11th Cir.1988) (relating officers' request for consent to search and check for warrants after traffic stop); *see also United States v. Mendez,* 118 F.3d 1426, 1429 (10th Cir.1997) ("An officer conducting

5

a routine traffic stop may run computer checks on the driver's license, the vehicle registration papers, and on whether the driver has any outstanding warrants or the vehicle has been reported stolen.").

The propriety of the continued detention of Simmons after the "normal time for a traffic stop ended" is governed by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. The detention of Simmons was proper if the officers could point to " 'specific and articulable facts which, taken together with rational inferences from those facts, justify a reasonable and articulable suspicion that the person seized is engaged in criminal activity.' " *Hardy,* 855 F.2d at 757 (quoting *Terry,* 392 U.S. at 21, 88 S.Ct. 1868). Although the "reasonable suspicion" standard is less demanding than probable cause, it must be more than an "inchoate and unparticularized suspicion or hunch." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citation and internal quotation marks omitted). Thus, in evaluating the validity of an investigative stop, we consider the "totality of the circumstances." *Id.* at 8, 109 S.Ct. 1581. Translated into the inquiry here, the question boils down to this: whether, in light of all of the circumstances the officers faced, they had a reasonable and articulable suspicion that Simmons was the subject of the Brevard County arrest warrant.

In echoing the district court's conclusion, Simmons argues that it was not reasonable for the officers to think that the warrant was for him because it was from a county on the other side of the state, that the date of birth on the warrant did not match the defendant's, that two and one-half months earlier police had run defendant's name, but had not detected any outstanding warrants, and that the warrant was for a worthless check, as opposed to a more "serious" crime. The government contends that the officers were entitled to investigate whether the warrant was for Simmons, even though the date of birth may not have completely matched up. The government has the better of the argument.

As we stated in *Hardy,* " 'if the initial stop was legal, the [officer] had the *duty* to investigate suspicious circumstances that then came to his attention.' " 855 F.2d at 757 (emphasis added) (quoting *United States v. Cruz,* 581 F.2d 535, 539 (5th Cir.1978) (en banc)). Here, the traffic stop was unquestionably legal

6

and the officers legally ran the computer check that turned up the Brevard County warrant. The mere fact that the warrant was from another county on the other side of a narrow state, or that it was for a worthless check, does not diminish the specific and articulable suspicion that the "Bobby Simmons" named in the warrant was the "Bobby Gene Simmons" who had been stopped. The difference in the date of birth is not fatal. Notably, the person described in the teletype concerning the warrant conformed to the person before the officers by first and last names, sex, race, and physical description. The difference of four years as applied to a man in his forties did not negate the positive matches. The officers' fruitless records check on Simmons two and one-half months earlier did not require a conclusion by the officers that this warrant was not for Simmons. The officers testified at the suppression hearing that they previously had received inaccurate information from their computer checks of warrants. At best, their prior check of outstanding warrants for Simmons was only one factor among many that a reasonable officer would have considered in deciding whether to detain Simmons to investigate further whether he was the subject of the outstanding Brevard County warrant. Although the degree of correlation between Simmons and the subject of the warrant may not have given the officers probable cause to arrest him, the correlation was far more than an inchoate "hunch." While the officers could have let him go and arrested him later because they may have known where to find him, no case has ever so held and we can discern no valid legal principle or compelling fact requiring them to do so. Indeed, a reasonable officer may well have viewed as a dereliction of duty the possibility of sending Simmons on his way without diligently attempting to verify whether the arrest warrant was really for him. We cannot fault their determination to do a sworn duty.

The courts refrain from "indulg[ing] in unrealistic second-guessing" of officers at the scene. *United States v. Sokolow,* 490 U.S. at 11, 109 S.Ct. 1581 (citation and internal quotation marks omitted). The determination of reasonable suspicion "does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law

7

enforcement officers." *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). We cannot say that Officers Frix and Rahmings acted unreasonably in detaining Simmons to investigate the warrant, even if the investigation ultimately did not produce definitive results. To hold otherwise would mean that the officers violated the Fourth Amendment when they briefly detained Simmons to verify whether he was the subject of the Brevard County warrant. Nothing in Fourth Amendment jurisprudence suggests such an answer.

Finally, the length of the delay consumed in the conduct of the investigative detention must have been "sufficiently limited in scope and duration to remain within the bounds" permitted by *Terry. Hardy,* 855 F.2d at 758. Several issues and circumstances are relevant to this analysis, including "the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention." *Id.* (citing *United States v. Sharpe,* 470 U.S. 675, 685-86, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)). Here, the law enforcement purpose served by detaining Simmons beyond the initial traffic stop was to confirm or reject, by computer check and follow-up teletype, whether Simmons was the subject of the Brevard County arrest warrant. We believe that this was a "method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference." *Id.* (citing *Sharpe,* 470 U.S. at 686, 105 S.Ct. 1568). Moreover, the district court found, and the record fully supports the finding, that the officers acted diligently with respect to the warrant. They tried to obtain further information from a variety of sources to clarify the identity of the "Bobby Simmons" who was the subject of the warrant. Promptly, they radioed the dispatcher to send a teletype to Brevard County, and after being put on hold, used their mobile computer to request the dispatcher to send the teletype. They also tried to contact their supervisor. We find that the "scope and intrusiveness" of the detention was relatively minor. Simmons sat in his own car during the time consumed by the entire stop.

We held in *Hardy* that a 50-minute investigative stop was not excessive under the circumstances. *See id.* at 761; *cf. United States v. Place,* 462 U.S. 696, 709, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (stating

8

that 90 minutes is "probably" too long for a *Terry* stop). Other courts have found a 30-minute wait for a computer check during a traffic stop reasonable. *See, e.g., United States v. Shareef,* 100 F.3d 1491, 1502 (10th Cir.1996); *United States v. Jones,* 44 F.3d 860, 871 (10th Cir.1995). We observe that longer traffic stops, during which nothing occurred to justify the additional detention, usually require extenuating circumstances to be upheld. *See United States v. Rutherford,* 824 F.2d 831, 833-34 (10th Cir.1987) (upholding a one-hour traffic stop where nearly one-half of the time was occasioned by problems with police computer).

In this case we find that the purpose of the detention, the officers' diligence in trying to prove or disprove that Simmons was the subject of the Brevard County warrant, the limited scope of the continued detention beyond that warranted for a "normal traffic stop," and the overall length of the total detention, all place Simmons' detention well within the bounds permitted by *Terry v. Ohio* and its progeny. The officers stopped Simmons at 6:14 p.m., and the officers returned to their vehicle at 6:18 p.m. to begin the routine processes of writing a citation *and* requesting checks of Simmons' license, tag and for outstanding warrants. The unrebutted evidence adduced at the suppression hearing showed that these officers spent 20 to 30 minutes on the "routine" part of this traffic stop. Thus, the issuance of a citation to Simmons would have been completed by around 6:44 p.m. to 6:48 p.m. The remainder of the time that elapsed until the narcotics-detecting dog alerted to Simmons' car some time between 7:05 p.m. and 7:10 p.m. constitutes the additional 17 to 26 minutes consumed by the attempts to determine whether Simmons was the subject of the Brevard County warrant. The intervening development of probable cause based upon the dog's alert, *see United States v. Holloman,* 113 F.3d 192, 194 (11th 1997), obviates the need for us to ascertain whether Simmons' continued detention until 7:32 p.m., when the Brevard County response was received, would have been reasonable.

Simmons contends, however, that the officers' request for a drug-detecting dog shortly after pulling Simmons over, when combined with the information they possessed concerning allegations of his earlier

9

involvement in the sale of cocaine, transformed the stop into an investigative detention for a drug search. However, we measure whether Officers Frix and Rahmings had reasonable suspicion to detain Simmons by considering whether an *objectively* reasonable police officer would make such a decision to detain. We need only determine whether a reasonable police officer, under the totality of circumstances, would have detained Simmons to investigate whether the arrest warrant for "Bobby Simmons" was for him. Nothing about the bases for suspecting that Simmons was a drug dealer in the neighborhood undermined the specific and articulable facts which justified a reasonable belief that Simmons was the subject of the Brevard County arrest warrant. Thus, we reject the contention that the precautionary request for the dog shortly after the officers effected the traffic stop, by itself, somehow transformed a stop and short detention, otherwise unambiguously supported by specific and objectively reasonable facts, into an unreasonable one.

We, therefore, reverse the district court's order suppressing the evidence on Fourth Amendment grounds and remand this case to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.