[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 6, 2005
THOMAS K. KAHN
CLERK

_____

No. 05-10376
Non-Argument Calendar

_____

D. C. Docket No. 03-20715-CR-JAL

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BRIAN MACKEY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(September 6, 2005)**

Before ANDERSON, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Brian Mackey appeals his conviction for being a convicted felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g). On appeal, he argues that the district court erred by denying his motion to suppress. For the reasons set forth more fully below, we **affirm**.

A Grand Jury indicted Mackey for one count of being a convicted felon in possession of a firearm and ammunition. Mackey initially pled not guilty, and proceeded to file a motion to suppress evidence seized as the result of an allegedly illegal detention and search. During a status conference, Mackey's attorney admitted that the issue would be one of credibility.

The district court held an evidentiary hearing, and the government first called Detective Garcia, one of the officers involved in Mackey's arrest. Garcia testified that, on April 24, 2003, while on patrol, he saw Mackey driving a Buick that matched a BOLO description for a vehicle wanted for several robberies. He also testified that he observed that the vehicle's left brake light was not working. Garcia radioed in that he was making a stop and stated that, while he often ran "tags" of vehicles subjected to a traffic stop, he could not recall doing so when he stopped Mackey's vehicle. As soon as Garcia had stopped Mackey's vehicle, Detective De La Vega pulled his vehicle alongside. Garcia then testified that, as he approached the driver's side of Mackey's stopped vehicle with his flashlight

2

drawn, he noticed Mackey placing what appeared to be a chrome item between the seats.

At the same time, Detective De La Vega, who was also approaching the car, shouted "55," which Garcia testified is a police signal for a firearm or weapon, and Garcia then ordered Mackey out of the vehicle, placed him in handcuffs, and patted him down for weapons, finding nothing at the time. Garcia mirandized Mackey, and Mackey then told Garcia that his nephew, who was a passenger in the car, had nothing to do with the firearm and the reason why Mackey had the firearm was because his brother had threatened to kill him. Once Mackey was arrested, he was more thoroughly searched and a brown paper bag, containing seven .25 caliber rounds of ammunition, was seized. While Garcia was speaking with Mackey, Detective De La Vega removed the passenger and had him sit on the trunk of the car. De La Vega also retrieved the firearm from inside the vehicle.

On cross-examination, Garcia stated that running a VIN number was a normal procedure, but it's not a procedure done on every vehicle stop. He also testified regarding standard police procedures for writing reports and indicated that he prepared an "A Form," which is essentially an affidavit for an arrest warrant. Garcia also testified regarding police incident reports and the preparation of a "State Attorney Case Summary Sheet," which is part of a packet containing several

police documents that is forwarded to the State Attorneys' Office in order to help determine whether a person will be prosecuted. Garcia testified that none of the police-prepared documents indicated that (1) Mackey was stopped because there was a BOLO; (2) there was a passenger in the vehicle; (3) a flashlight was used when approaching the vehicle; or (4) Mackey's tag was run through records, revealing that it had the wrong license plate.

Garcia was also questioned regarding an earlier deposition he gave, in which he testified that Mackey was stopped for a minor traffic violation, but never mentioned the BOLO. Garcia could not recall running Mackey's tag on the night of the stop. He also admitted that he should have written the BOLO down in his reports, but failed to do so. However, Garcia's deposition, the offense incident report, and arrest complaint form (A Form) all indicated that Mackey was stopped because of a non-working brake lamp or taillight.

Next, the government called Detective De La Vega, who assisted Garcia on the night of Mackey's arrest. De La Vega testified that he responded to Garcia's radio communication indicating that Garcia was performing a stop and, because he was in the area, arrived on the scene within seconds. De La Vega approached Mackey's vehicle carrying a flashlight from the passenger's side while Garcia approached from the driver's side. He saw in the passenger's seat a black male

who was later identified as Mackey's nephew and, as he looked into the car, saw Mackey place a chrome object, which De La Vega believed to be a firearm, between the driver's and passenger's seat. De La Vega signaled to Garcia the police code for gun, "55," and removed the passenger from the car, patting him down for weapons. De La Vega, after being sure that Mackey and the passenger were secured at the rear of the vehicle, went into the vehicle through the passenger door and removed a firearm loaded with .25 caliber bullets.

On cross-examination, De La Vega stated that, as he understood it, the reason Mackey was stopped was for a traffic infraction. De La Vega stated that the tag on Mackey's car was run and, when showed his deposition testimony, admitted that the tag was run before Mackey's car had been stopped. He further stated that he filled out the property receipt for the seized firearm and, on it, marked that the firearm and the ammunition had been impounded at 9:05 p.m. on April 24, 2003. De La Vega could not recall whether he told Mackey or the passenger that they were stopped because of a taillight being out, nor did he recall whether anyone talked about the wrong tag being on the vehicle. He also could not recall whether his hand gun was drawn when he approached the vehicle, but stated that he had done so during previous stops for minor traffic infractions. Finally, with respect to calling in tags, De La Vega stated that it was his practice to call in tags, that tags

5

are commonly called in wrong and, when that happens, the tags are called in again.

Mackey's first witness was Teth Milligan, his nephew, who was the passenger in the car on the night of Mackey's arrest. Milligan testified that, after they were pulled over, the officers approached with their guns drawn and asked him and Mackey to exit the car, at which point Mackey asked the officers why he had been stopped. The officers said that the tag didn't match the car, it related to a trailer. Milligan was patted down, his belongings removed from his pocket and returned to him. After Mackey was taken into custody, the officers had Milligan sign a waiver and he drove the car home.

On cross-examination, Milligan testified that he did not know whether or not the brake lights were working. Milligan further testified that he overheard the officer's statement that Mackey had been stopped because the tag on his car matched a trailer while he was having a conversation with the other officer.

Mackey then proffered, with the government's consent, three exhibits showing the following. At Mackey's request, a Rebecca Weir conducted an off-line search of "TAR" reports indicating that, at 8:49 p.m., a tag T02DET was run by Lisa Nesbitt from the Metro-Dade Police Department from a particular computer. The response she received indicated that the tag belonged to a homemade trailer. At 8:54 p.m., Nesbitt used the same computer to run tag

6

T02QET and the VIN number for the car Mackey was driving, and T02QET was the correct tag number for that VIN number, which indicated the car belonged to Lloyd Mackey. Finally, at 9:05 p.m., Nesbitt ran the serial number of the firearm seized from Mackey's car to see if the firearm had been reported stolen or used in a crime, and the report was negative.

As a rebuttal witness, the government called Detective Errol Gardner of the Miami Dade Police Department, who conducted a telephonic interview of Milligan while assigned to the Department of Alcohol Tobacco and Firearms ("ATF"). Gardner discussed the events of April 24, 2003, with Milligan, and Milligan indicated to Gardner that, at the time Mackey's vehicle was stopped, officers jumped out and made reference to the taillight. Gardner had not mentioned the taillights to Milligan before Milligan had made his statement. The defense attempted to imply that Gardner did not attempt to contact Milligan until after there had been allegations made that the officers might have committed perjury regarding their reasons for stopping Mackey's vehicle, but Gardner denied that it was true. Finally, Gardner testified that he asked Milligan to meet with him in person, but Milligan declined to do so.

No further evidence was presented and, on the basis of the foregoing testimony, the government argued that there was simply no basis to challenge the

credibility of Garcia's statement that he stopped Mackey's vehicle for having a taillight out, a permissible basis for a traffic stop. After the permissible stop, Garcia and De La Vega observed Mackey tucking what appeared to be a gun between the driver's and passenger's seats. The government argued that there was no dispute that the officers had the ability to see into the car and see the weapon.

Addressing the defense's evidence, the government first argued that Milligan's testimony was not entirely credible because (1) he had no evidence to refute the taillight was out; (2) he is biased toward his uncle, Mackey, and biased against the police; and (3) despite the defense's questions regarding Gardner's diligence in pursuing Milligan, Gardner stated that Milligan heard the police say that Mackey was stopped because of a taillight, contradicting Mackey's testimony during the hearing that he never mentioned the taillight to anyone. As to the "TAR" reports, the government first argued that, if the police had run the wrong tag, and believed that Mackey's vehicle had a tag violation, that would have been a permissible reason for the stop. It went on to argue, however, that Garcia did not recall running the tag, but that if he had, there was testimony that incorrect tag numbers are commonly given and, in any event, there was still no evidence to refute that the vehicle was stopped for anything other than a taillight violation, making the TAR reports irrelevant.

8

Mackey, in response, argued that the evidence showed that, only after the police discovered that the tags were correct, was the serial number of the firearm run. Mackey then argued that the BOLO description was not listed on any of the relevant police reports and, more importantly, Milligan was not listed as a passenger or witness on any of the police reports either. Mackey argued that the police deliberately left Milligan off the reports because they didn't want a witness who would come forward and testify that the reason Mackey was stopped was because the tag on his vehicle was run incorrectly. He also pointed out that the officers approaching the car with their guns drawn was more consistent with a belief that the vehicle had the wrong tags than with a broken taillight. With respect to the weapon, Mackey argued that it was unbelievable that Mackey would wait until the officers were next to his window before attempting to conceal it. Mackey further argued that the timing of the TAR reports, combined with the property receipt, clearly indicated that the firearm was not impounded and discovered until after the tag and VIN had been run correctly. Finally, Mackey argued that the TAR reports confirmed Milligan's testimony because, absent the officers stating that Mackey had been pulled over for having the wrong tag, there was no way for Milligan to have known that, in fact, the tag had been run at all, let alone incorrectly.

In rebuttal, the government argued that Milligan's testimony demonstrated that his stories "flip-flopped" and lied openly about major issues in the case. It also argued that Mackey's attempt to use the TARs as evidence of a police conspiracy to lie and cover up improper tag was unsupported and that the uncontroverted evidence still showed that the reason for the stop was, in fact, the broken taillight. Finally, it argued that, even under Mackey's theory of events, on which the government did not rely, the stop and the seizure were legal because the officers didn't know they had the wrong tag until Mackey was out of the car, which was after the gun had been seen anyway.

The district court orally denied Mackey's motion to dismiss, finding that the credible testimony established probable cause to stop Mackey's vehicle for a traffic violation. It found the officers' testimony with regard to the brake lamp being out consistent and further found that the TAR reports did not affect the finding of probable cause for the initial stop. Once the vehicle had been legally stopped, the court found that the officers discovered the firearm in plain view, rendering the seizure legal as well. The court had credibility issues with Milligan's testimony, and did not believe it inconsistent with the officers having probable cause to make a stop on the basis of traffic violation separate from the issue of the tag. The court later issued a written decision consistent with its oral decision. After the motion

10

had been denied, Mackey signed a conditional plea of guilty, reserving his right to appeal the court's ruling on the motion to suppress. The same plea was entered in open court. Mackey was adjudged guilty, sentenced to 180 months' imprisonment, and ordered to forfeit the firearm and ammunition.

On appeal, Mackey argues that the district court erred by denying his motion to suppress because the TAR reports, combined with the veracity of Milligan's testimony that the police stopped Mackey because the tag on the vehicle did not match the trailer to which it was supposed to be assigned, prove that the police seized the firearm after the probable cause for the traffic stop had evaporated and, thus, the seizure was outside the scope of the original stop and without probable cause. Specifically, Mackey argues that Milligan's testimony was credible and that the officers' testimony, regarding the taillight and Mackey's attempted concealment of the firearm, is not credible. Thus, he argues that, at the time police became aware that the tag on the vehicle was correct, any continuation of the stop was without probable cause or reasonable suspicion and, therefore, the seizure of the firearm after 8:54 p.m. was violative of the Fourth Amendment. Finally, Mackey argues that the seizure was also not made incident to arrest because he was not placed under arrest until after the firearm had been found.

"A district court's ruling on a motion to suppress presents a mixed question

11

of law and fact." United States v. Zapata, 180 F.3d 1237, 1240 (11th Cir. 1999). We accept the district court's findings of fact to be true, unless shown to be clearly erroneous, and review the district court's application of the law to those facts de novo. Id. These factual findings include the district court's credibility determinations, to which we "accord considerable deference." United States. v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (citation and internal quotation marks omitted). In fact, we have stated that "we should defer to the . . . judge's [credibility] determinations unless his understanding of the facts appears to be "unbelievable." Id. (citation omitted). "[A]ll facts are construed in the light most favorable to the prevailing party below." United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000). "The individual challenging the search has the burdens of proof and persuasion." United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998).

The Fourth Amendment protects individuals from "unreasonable searches and seizures" by government officials, and its protections extend to "brief investigatory stops of persons or vehicles." United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002). For brief investigatory stops, the Fourth Amendment is satisfied if the police officer has a "reasonable suspicion" to believe that criminal activity "may be afoot." Id. (citing Terry v.

Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). When determining whether reasonable suspicion exists, courts must consider the totality of the circumstances to determine whether the police officer had a "particularized and objective basis" for suspected legal wrongdoing. Arvizu, 534 U.S. at 273, 122 S.Ct. at 750. A decision to stop a vehicle is reasonable under the Fourth Amendment where an officer has probable cause to believe that a traffic violation occurred. United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999).

Secondly, "an officer's investigation of a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (quotation and citation omitted). The stop must be of limited duration and may not last "any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity." United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). The duration of the traffic stop "must be limited to the time necessary to effectuate the purpose of the stop." Id. However, where the initial traffic stop is legal, the officer has "the duty to investigate suspicious circumstances that then [come] to his attention." United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991).

Here, Garcia testified that the reason he stopped Mackey's vehicle was

because it had a brake lamp/taillight out. This testimony was consistent with testimony given at Garcia's deposition as well as the "A Form" and the incident report. Furthermore, while the TAR reports indicate that the tag was called in, Garcia's testimony was that he could not recall whether he had called in the tag, not that he didn't call in the tag. There was no showing made that the taillight of Mackey's vehicle was operational on April 24, 2003, and, therefore, no evidence that Garcia's testimony is not entitled to deference. The district court found the testimony credible and, therefore, giving the deference that we are required to give, there is no evidence that Garcia's testimony is unbelievable. Thus, taking the facts in a light most favorable to the government, under Florida law, Garcia had probable cause to believe a traffic violation occurred and the stop was legal.[1]

Moreover, we could also assume that the reason Garcia stopped Mackey is that he called in the wrong tag and mistakenly believed that Mackey's vehicle reflected the tag of a trailer. There was testimony from De La Vega that mistakes calling in tags are common and, in this case, Garcia would have been off by one letter, having called in T02DET instead of T02QET. When he called in the tag and

---

[1] Florida law provides that every motor vehicle is required to have two or more functional "stop lamps." Fla. Stat. Ann. § 316.222. It is a violation of Florida law to operate a vehicle that is not equipped with two or more functional stop lamps. Id. § 316.215. Florida permits police officers to stop vehicles upon a reasonable belief that the vehicle's equipment is not in proper repair. Id. § 316.215.

14

it was reported that T02DET belonged to a trailer, not Mackey's Buick, Garcia had probable cause to conduct a traffic stop and investigate. The unrefuted testimony from the point Mackey was stopped was that Garcia and De La Vega, with or without guns drawn, approached the back of the car with their flashlights on and saw what they believed to be a chrome weapon being concealed between the driver's seat and the passenger's seat. It was not until Mackey was outside the vehicle that the officers had any notice that they had called in the wrong tag. By that point, even if the original reason for the stop had been rendered moot because the tag was correct, they had reasonable suspicion of other possible illegal activity because of the weapon and were justified to investigate further.[2] See, e.g. Purcell, 236 F.3d at 1277-78 ("The traffic stop may not last 'any longer than necessary to process the traffic violation' unless there is articulable suspicion of other illegal activity.").

Accordingly, Officer Garcia's testimony was not incredible and we must afford it deference. Taking the facts in a light most favorable to the government, Garcia had probable cause of a traffic violation and, therefore, the stop was legal and did not violate the Fourth Amendment. Even giving Mackey the benefit of the doubt, however, the traffic stop was still legal because the improper tag, followed

_____

[2] Carrying a concealed firearm without a license is a violation of Florida law. Fla. Stat. Ann. § 790.01.

15

by the officers' suspicion of a weapon in the car, provided an articulable basis for prolonging the stop even after the officers learned that the tag and VIN were properly matched.

Finally, with respect to the firearm found in the car, both Garcia and De La Vega testified that, as they approached Mackey's vehicle with their flashlights, they saw what appeared to be a chrome firearm. De La Vega signaled "55," the police signal for a firearm to Garcia, and both officers testified consistently on both of these points. After a traffic stop has occurred, an officer may seize any contraband, including weapons, in plain view. Purcell, 236 F.3d at 1277. While Mackey argues that it doesn't make sense that he would wait until the officers were upon him before trying to conceal the weapon, it was his burden of proof and persuasion and he offered no evidence refuting the officers' otherwise credible testimony. Taken in a light most favorable to the government, and finding no reason to conclude that the officers' testimony was inherently unbelievable, the weapon was found in plain view and, therefore, the officers were authorized to seize the weapon under the "plain view" doctrine. Id. Furthermore, having suspected that a weapon was in the vehicle, the officers were justified in performing a protective sweep and, in fact, were required to investigate the suspicious circumstances that had come to their attention. Id.; Harris, 928 F.2d at

16

1117.

Thus, we conclude that the district court's did not commit reversible error when it denied Mackey's motion to suppress because there was probable cause to perform a traffic stop and the weapon was in plain view. We, therefore, affirm.

**AFFIRMED.**