[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**September 19, 2008**
**THOMAS K. KAHN**
**CLERK**

No. 08-10240
Non-Argument Calendar

_____

D. C. Docket No. 07-00089-CR-TWT-1-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CESERE GORSON CRAWFORD,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(September 19, 2008)**

Before HULL, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

Cesere Crawford appeals his conviction and 120-month sentence for being a

felon in possession of firearms, in violation of 18 U.S.C. § 922(g)(1). After review, we affirm.

## I. BACKGROUND

**A.     Crawford's Arrest**

At the suppression hearing and trial, Sandy Springs Police Officer Michael Dewald testified to these events. Crawford was driving on I-285 at approximately 1:50 a.m. when he was pulled over by Officer Dewald. As Crawford's car passed, Officer Dewald noticed that the registration light on Crawford's car was out, which is a traffic violation, and that the car swerved from lane to lane. Officer Dewald followed Crawford's car and saw the car make an abrupt lane change to exit the highway, almost driving off the road. Dewald initiated a traffic stop, and Crawford pulled his car into a parking lot, but did not stop in a parking space. Dewald pulled his police cruiser in behind Crawford's car at a ninety degree angle.

When Dewald asked for Crawford's driver's license and valid proof of insurance, he noticed that Crawford appeared unusually nervous and was sweating profusely and his carotid artery was beating at a high rate. Based on these observations, Dewald suspected that criminal activity was afoot.

Crawford handed his insurance documentation to Dewald, but acted like he did not have his driver's license. Dewald noticed that Crawford's hand was

2

trembling. Dewald asked Crawford to exit the car and go between the two cars. At this point, Dewald asked Crawford if there were any weapons in his car or on his person. Crawford responded, "I do not have anything on me. But any guns in the car are not mine. It's not my car." Dewald asked Crawford for his driver's license, and Crawford said his license probably was suspended for tickets. Crawford began to look around, which suggested to Dewald that Crawford might try to run. Dewald again asked about any firearms or weapons, and Crawford stated, "[W]ell not to my knowledge and, like I said, the car, it's not mine. Because the guy who owns it, the guy who owns the car hunts." Crawford's statement indicated to Dewald that there were firearms in the car, but Crawford was disclaiming any interest in them.

Dewald obtained Crawford's name and date of birth, which Dewald relayed to a radio operator. The radio operator reported that Crawford's license was suspended. Dewald then placed Crawford under arrest for driving with a suspended license. A search of Crawford's person revealed a Georgia state correctional photo identification card with Crawford's name on it. Dewald placed Crawford in his police cruiser and contacted the radio operator and requested a wrecker to impound Crawford's car. Dewald impounded the car because

3

Crawford had been arrested, the registered owner was not present to take control of the car and Dewald could not leave the car in the middle of the parking lot.

While waiting for the wrecker to arrive, Dewald conducted an inventory search of the car and completed the police department's inventory forms. In the passenger compartment, Dewald found seven cellular telephones. In the trunk, Dewald found three firearms, two ski masks, eight sets of flex-cuffs and black battle dress uniform pants, which were partially covering the firearms. These pants were military style and had cargo pockets. The firearms were a Ruger .44 Super Blackhawk loaded with five rounds, a Smith & Wesson .38 Special loaded with four rounds and a Smith & Wesson .32 Long loaded with two rounds. After retrieving the firearms, Dewald ran a criminal history check on Crawford and determined that he was a convicted felon. Dewald did not read Crawford his Miranda rights at the scene.

## B. Motions to Suppress

Prior to trial, Crawford filed motions to suppress (1) his pre-arrest statements made to Officer Dewald because they were made without a Miranda warning; and (2) the fruits of Officer Dewald's inventory search, arguing the search was pretext for an investigation. Crawford also moved to dismiss his indictment, arguing that § 922(g) was facially unconstitutional because it did not

4

contain as a jurisdictional element a connection between the firearms and interstate commerce.

After the suppression hearing, the magistrate judge's report ("R&R") recommended denial of the motions to suppress. The magistrate judge concluded that (1) Dewald's questioning of Crawford during the routine traffic stop did not require a <u>Miranda</u> warning and was justified to protect his own safety; and (2) the firearms were found pursuant to a lawful inventory search consistent with the Sandy Springs Police Department's policy. Alternatively, the magistrate judge concluded Dewald had probable cause to search Crawford's car. Finally, the magistrate judge, citing this Court's binding precedent upholding the constitutionality of § 922(g) under the Commerce Clause, recommended denying Crawford's motion to dismiss the indictment. Over Crawford's objections, the district court adopted the R&R and denied Crawford's motions to suppress and to dismiss the indictment.

## C.    Trial

At trial, Dewald again testified about the above events during Crawford's arrest. Dewald also testified that the firearms found in the trunk of Crawford's car were not hunting weapons.

Johnny Wyatt owned the car Crawford was driving. At trial, Wyatt testified he had purchased the car for his daughter, Yaka Wyatt, who was Crawford's girlfriend. According to Wyatt, he last drove the car on July 6, 2006, less than two weeks before Crawford's arrest and had not seen any firearms in the trunk at that time or at any other time. Wyatt did not own any firearms, did not hunt and never told anyone that he was a hunter. The pants found in the trunk did not belong to Wyatt. On cross-examination, Wyatt admitted that he did not know if people other than Crawford had driven the car, did not see Crawford place the firearms in the trunk of the car and did not know how the firearms got into the trunk of the car.

Yaka Wyatt also testified and explained she had been dating Crawford since July 2006 and he was the father of her children. Yaka kept the car at her home, locked, and no one else had access to it. Yaka explained that the only time Crawford drove the car was on July 14, 2006, the night he was arrested. According to Yaka, she gave Crawford the car on July 13 so he could pick her up on July 14 and drive her to a medical appointment. Yaka had not driven the car in the week prior to July 14. The last time Yaka drove the car, she did not look inside the trunk; however, the last time she looked in the trunk, she did not see any firearms. Yaka also does not own any firearms or hunt. Yaka had never seen the firearms found in the trunk of her car and did not know where they came from.

6

Yaka never saw Crawford with firearms. Crawford's last job was as a security officer, for which he would wear black cargo pants resembling those found in the trunk of her car with the firearms.

The government called two expert witnesses over Crawford's objection. Shane Barkley, a crime scene analyst who examined latent fingerprints, testified about the factors that determined whether he was able to obtain a latent fingerprint from a firearm. Only two to three percent of the firearms Barkley had examined yielded latent fingerprints. Barkley examined the firearms found in the trunk of the car Crawford was driving and did not find any latent finger prints on them.

Jacqueline Williams, a fingerprint examiner with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), testified about the factors that determined whether a surface could produce latent fingerprints. Latent fingerprints were recovered from firearms ten to fifteen percent of the time, and from ammunition even less frequently. Williams stated that the ammunition in the trunk did not reveal any latent fingerprints suitable for comparison with a known fingerprint.

Crawford objected to the expert testimony of Barkley and Williams because, although he received a fingerprint lab report, he did not receive a

summary of their testimony or notice that Barkley would testify as an expert. The district court overruled Crawford's objections.

The government called ATF special agent Allen McLeod who testified that he was a recreational hunter who owned hunting firearms and that there were no hunting uses for the type of firearms found in the car Crawford drove. It also was not normal practice to transport a hunting firearm loaded with ammunition. Steven Kosch, another ATF agent, testified that the firearms found in the trunk of the car were manufactured outside the state of Georgia. The government entered into a stipulation that Crawford was a convicted felon before July 14, 2006.

After the government rested, the district court denied Crawford's motion for a judgment of acquittal. Crawford called no witnesses in his defense. The jury found Crawford guilty.

## D.    Sentencing

The presentence investigation report ("PSI") recommended a base offense of 24, pursuant to U.S.S.G. § 2K2.1(a)(2), and a two-level enhancement, pursuant to U.S.S.G. § 2K2.1(b)(1)(A), because the offense involved three firearms. With a total offense level of 26 and a criminal history category of VI, the PSI recommended an advisory guidelines range of 120 to 150 months' imprisonment.

The PSI noted that Crawford's counsel had declined to allow the probation office to interview Crawford. The PSI also stated that Crawford had been diagnosed with paranoid schizophrenia in 1998, had been treated at several mental health facilities and had attempted suicide on four occasions, the last time on September 13, 2006.

Crawford's only objection to the PSI was a request for a downward departure because his mental health affected his decision-making ability, which contributed to his high criminal history score. Crawford filed a separate motion for a "Downward Adjustment" of his sentence on the same ground.

At the sentencing hearing, the district court confirmed that there were no objections to the PSI's guideline calculations and adopted those calculations. The district court found that Crawford's advisory guidelines range was 120 to 150 months' imprisonment, but that the statutory maximum sentence was 120 months' imprisonment.

The district court acknowledged receiving Crawford's sentencing memorandum and motion for a downward adjustment. Crawford argued, based on the 18 U.S.C. § 3553(a) factors, for a sentence below the advisory guideline range. The district court responded that, although it found it troubling that counsel would

not allow the probation office to interview Crawford, it would not affect

Crawford's sentence, as follows:

> THE COURT: You would not allow the probation officer to interview the Defendant. I find that troubling on many levels. Is this a new policy of the Federal Public Defender's Office?
> Mr. HAWKER: No, no. That was just a decision that I made. It's not policy.
> THE COURT: Well, it's not going to make a difference in this case; but I can easily envision a case where I would say I will not consider a below guidelines sentence based upon the history and characteristics of the Defendant where the Defendant has refused to cooperate with the probation office in the investigation of that history and those characteristics. So, for future reference, I would say you are on very, very dangerous ground in advising your client not to cooperate in the probation officer's preparation of the Pre-Sentence Report.
> As I say, it's not going to be determinative in this case. But I'd think long and hard before I ever did that again if you have got a case before me.

Defense counsel reiterated his argument that Crawford's criminal history score

was overrepresented and "need[ed] to be viewed in the prism of him suffering

from the mental illness." In response, the district court stated again that

Crawford's refusal to be interviewed by the probation office was "not going to be

determinative in this case," but pointed out that by "making a unilateral

presentation" regarding Crawford's mental health, the probation office and the

government had been unable to investigate the issue thoroughly and to ensure that

the district court would "have the benefit of a full record." Nonetheless, the

10

district court advised that it would "hear everything [defense counsel] want[ed] to say" on the issue.

Crawford's counsel then argued that Crawford's criminal history score was high because Crawford was unmedicated before 1998 and pointed out that all but one of his offenses after 1998 were the result of Crawford not receiving medication. Crawford also argued that the court should consider that he had been incarcerated since his arrest. Crawford requested a 103-month sentence.

The government responded that Crawford could not receive a downward departure for reduced mental capacity, pursuant to U.S.S.G. § 5K2.13, because his offense involved actual violence or threats of violence. The government pointed out that Crawford's criminal history indicated he needed to be imprisoned to protect the public and that it was likely Crawford was going to commit violent acts the night he was arrested because he had flex cuffs, ski masks and loaded firearms. The government noted that Crawford's sentence should not be reduced based on his post-arrest detention because he had been on parole when he was arrested. The government argued a 120-month sentence was necessary to protect the public and to ensure Crawford received mental health treatment.

The district court declined to impose a sentence below the advisory guidelines range given the seriousness of the offense and Crawford's history and

characteristics. The district court stated that, although Crawford's mental illness may have substantially contributed to his criminal history, his criminal history was very disturbing, noting that Crawford had been arrested for murder in March 1996, armed robbery in March 1997 and aggravated assault and rape in May 1997. The district court stated that it normally would not consider those arrests, but Crawford had been convicted of similar conduct, such as aggravated assault in February 1997, obstruction of a police officer in 1999 and making terroristic threats in 1998. The district court emphasized that Crawford's offenses and arrests made him look like a dangerous person who should not be given a below-guidelines sentence.

The district court then stated:

Given the picture that I just painted of an unstable, assaultive person, the idea that Mr. Crawford was riding around in a car at 2:00 or 3:00 in the morning with three handguns, handcuffs, ski masks, that is a scary, scary situation. And, again, its not a circumstance where a non-guideline sentence would be appropriate. If the low end of the guideline was not the maximum that could be imposed on this charge, I would impose it anyway considering the sentencing factors set forth in Title 18, Section 3553(a).

The district court imposed a 120-month sentence. Crawford timely appealed.

## II. DISCUSSION

A.    **Inventory Search**

12

Although "[t]he Fourth Amendment generally requires police to secure a warrant before conducting a search," under certain circumstances, car searches are an established exception.   Maryland v. Dyson, 527 U.S. 465, 466, 119 S. Ct. 2013, 2014 (1999).  Accordingly, a warrantless inventory search of a legally impounded car conducted pursuant to an established procedure is valid under the Fourth Amendment.  South Dakota v. Opperman, 428 U.S. 364, 372-73, 96 S. Ct. 3092, 3098-99 (1976).[1]

The Supreme Court has indicated that police may exercise discretion in deciding to impound a car "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity."  Colorado v. Bertine, 479 U.S. 367, 375, 107 S. Ct. 738, 743 (1987).  However, inventory searches are "limited to effectuation of the recognized purposes for which they are conducted and they may not be used as a pretext for intrusive investigatory searches that would otherwise be impermissible."  United States v. Bosby, 675 F.2d 1174, 1179 (11th Cir. 1982) (quotation marks omitted).  "Nevertheless, the mere expectation of uncovering evidence will not vitiate an otherwise valid inventory search."  Id.

---

[1]We review the district court's legal conclusions on Fourth Amendment claims de novo. United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999).  The district court's findings of fact are reviewed for clear error.  Id.

Here, Officer Dewald impounded the car Crawford was driving after arresting him for driving with a suspended license and conducted an inventory of the car's contents pursuant to the vehicle-impound policy of the Sandy Springs Police Department. That policy states that "an impound occurs when an officer takes custody of a car and causes it to be removed by one of the City-authorized wrecker services." The policy authorizes impound when "the operator of a vehicle is arrested, and there is no other person authorized and capable of taking control of the vehicle." The arresting officer "may request, on the operator's behalf, for a driver to be en route from a secondary location, provided that such a request will not cause an unreasonable delay in the arrest procedure." In addition, the policy provides that an officer shall conduct an inventory of the impounded car and make a report of the inventory documenting its contents. The purpose of an inventory is "to ensure that valuable possessions within a car under police custody are accounted for."

The district court did not clearly err in finding that Dewald's inventory search was valid and not pretext for an investigatory search. First, we reject Crawford's argument that Officer Dewald violated the vehicle-impound policy by performing the inventory search before the wrecker had removed the car. It was a reasonable application of the policy for Dewald, after deciding to take custody of

14

the car and while waiting for the wrecker, to conduct an inventory search. Indeed, requiring an inventory search to be performed only after the car has been removed would defeat the purpose of ensuring that valuables inside the care were safely secured. Furthermore, although the government did not produce Dewald's inventory report at the suppression hearing, the district court found credible Dewald's testimony that he had completed the report.

In addition, Dewald's decision to impound the car without first locating another driver was not unreasonable under the circumstances. Crawford was alone in the car when Dewald pulled him over. At the time of Crawford's arrest, it was 2:00 a.m. and the car was left in the middle of a parking lot, but outside a parking space. Although the car needed to be moved, finding another driver at that time would have been unlikely and would have caused significant delays. See United States v. Roberson, 897 F.2d 1092, 1096 (11th Cir. 1990) (upholding an inventory search of an impounded car in a parking lot, noting that there was no one present to whom the officer could have given possession of the car). Because Dewald complied with the vehicle-impound policy and reasonably exercised his discretion under that policy to impound the car, the fact that Dewald suspected he might find evidence of criminal activity did not convert the inventory search into an

investigatory one.  See Bosby, 675 F.2d at 1179.[2]  Accordingly, the district court did not err in denying Crawford's motion to suppress the firearms found during the search.

**B.      Pre-arrest Statements**

Under Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 1612 (1966), "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights."  United States v. Parr, 716 F.2d 796, 817 (11th Cir. 1983).  "The requirement that an individual receive Miranda warnings before answering questions applies only when the individual is in custody."  United States v. Torkington, 874 F.2d 1441, 1445 (11th Cir. 1989).  In determining whether an individual is in custody, the test is whether a reasonable person "would have felt a restraint on his freedom equivalent to that normally associated with a formal arrest."  Id. (quotation marks omitted).

Generally, a person temporarily detained pursuant to an ordinary traffic stop is not "in custody" for the purposes of Miranda.  Berkemer v. McCarty, 468 U.S. 420, 440, 104 S. Ct. 3138, 3150 (1984).  However, a stopped motorist is

---

[2]Because the search was pursuant to a valid inventory search, we do not address whether there was probable cause to search the car.

considered "in custody" if he is subjected to treatment during the traffic stop that amounts to a restriction of freedom to a degree associated with a formal arrest. See id.[3] A police officer's unarticulated plan to arrest a suspect has no bearing on whether a reasonable person would have felt a restraint on his freedom associated with arrest. Id. at 442, 104 S. Ct. at 3151.[4]

Crawford contends that he was "in custody" when he made the statements to Dewald during the traffic stop. We disagree.

Dewald first questioned Crawford about weapons after Crawford informed him he was not in possession of his license and again questioned Crawford about weapons after Crawford stated his license probably was suspended. At the time of the questioning, Crawford was standing at the back of his car in a parking lot open to public view, he was not physically restrained, he was questioned only briefly and he was not told he was going to be arrested. There is no evidence that Dewald was accompanied by other officers, drew his gun or ordered Crawford into a

---

[3]Whether a defendant was in custody and entitled to Miranda warnings is a mixed question of law and fact, and the district court's factual findings are reviewed for clear error, and its legal conclusions are reviewed de novo. United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996).

[4]We find unpersuasive Fifth Circuit cases cited by Crawford for the proposition that once an officer has probable cause to arrest a motorist, he must issue Miranda warnings before further questioning the motorist. See Windsor v. United States, 389 F.2d 530, 534 n.5 (5th Cir. 1968); Bendelow v. United States, 418 F.2d 42, 46-47 (5th Cir. 1969). These cases predate and are inconsistent with the Supreme Court's holding in Berkemer that a police officer may continue to question a motorist even if he intends to arrest the motorist, as long as that intention is unannounced. 468 U.S. at 441-42, 104 S. Ct. at 3151.

17

position, such as on the ground or against a car, more commonly associated with a formal arrest. The restraint to which Crawford was subjected at the time he answered Dewald's questions was "the minimal amount necessary for such a stop" and "did not involve the type of 'highly intrusive' coercive atmosphere that may require Miranda warnings even before a formal arrest is made." See United States v. Acosta, 363 F.3d 1141, 1150 (11th Cir. 2004).

For all of these reasons, the district court did not err in denying the motion to suppress Crawford's statements to Dewald during the traffic stop.

## C. Sufficiency of the Evidence

To convict a defendant of being a felon in possession of a firearm, the government must prove beyond a reasonable doubt that: (1) the defendant was a convicted felon; (2) the defendant knowingly possessed a firearm; and (3) the firearm was in or affected interstate commerce. United States v. Deleveaux, 205 F.3d 1292, 1296-97 (11th Cir. 2000). Crawford argues that the government failed to carry its burden to show he knew about the firearms in the trunk of the car. We disagree.[5]

[5]We review de novo the disposition of a defendant's properly preserved motion for judgment of acquittal. United States v. Perez-Tosta, 36 F.3d 1552, 1556 (11th Cir. 1994). We must determine whether "a reasonable fact-finder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt." United States v. Pistone, 177 F.3d 957, 958 (11th Cir. 1999). In so doing, we "view the facts, and draw all reasonable inferences therefrom in the light most favorable to the government." United States v. Hansen, 262 F.3d 1217, 1236 (11th Cir. 2001) (quotation

Officer Dewald testified that Crawford drove erratically when Dewald began to follow him and appeared nervous during the traffic stop. According to Dewald, Crawford brought up guns in response to Dewald's questions about weapons. Specifically, when Dewald asked Crawford whether he had any weapons, Crawford said, "I do not have anything on me, but any guns in the car are not mine. It's not my car." When Dewald asked again about weapons, Crawford said, "Well, not to my knowledge. Like I said, they are not mine because the guy who owns the car hunts." In addition, there was testimony that the firearms found in the trunk were not the kind used for hunting.

Furthermore, Johnny and Yaka Wyatt testified that: (1) they were the only other people with access to the car; (2) they did not own any firearms or hunt; and (3) they did not know how the firearms got inside the trunk of the car. Johnny Wyatt also testified there were no firearms in the trunk a week earlier, and Yaka Wyatt testified the pants in the trunk, which were on top of the firearms, were similar to pants Crawford had worn.[6] Based on this evidence, the jury could have

marks omitted).

[6]Crawford argues that Yaka Wyatt's testimony was contradictory and unreliable because she admitted to lying to investigators about where she kept her car. Crawford has not shown that Yaka's testimony was incredible as a matter of law. See United States v. Thompson, 422 F.3d 1285, 1291 (11th Cir. 2005) (defining incredible testimony as "testimony as to facts that [the witness] could not have possibly observed or events that could not have occurred under the laws of nature") (alteration in original). Thus, we have no cause to disturb the jury's finding that Yaka Wyatt was credible. See

19

reasonably concluded that Crawford placed the firearms in the car and, thus, knowingly possessed the firearms.

## D. Expert Testimony

Crawford contends that the district court should not have admitted the two fingerprint experts's testimony because the government failed to provide a summary of their testimony as required by Federal Rule of Criminal Procedure 16.

Rule 16 provides that, "[a]t the defendant's request, the government must give to the defendant a written summary of any testimony" that will be introduced by an expert witness during the government's "case-in-chief at trial," including a description of the witness's opinions and "the bases and reasons for those opinions." Fed. R. Crim. P. 16(a)(1)(G). However, Rule 16 violations are subject to harmless error review and "will result in reversal of conviction only if such a violation prejudices a defendant's substantial rights." United States v. Chastain, 198 F.3d 1338, 1348 (11th Cir. 1999) (quotation marks omitted). To be entitled to a new trial, "actual prejudice must be shown." Id. (concluding any error was harmless because the defendants had not shown that the Rule 16 violation "adversely affected their ability to present a defense").

United States v. Thompson, 473 F.3d 1137, 1142 (11th Cir. 2006), cert denied, 127 S. Ct. 2155 (2007) ("The jury gets to make any credibility choices, and we will assume that they made them all in the way that supports the verdict.").

Here, Crawford has not shown that the failure to provide a summary of the fingerprint experts's testimony prejudiced his substantial rights.[7] At trial, Barkley and Williams explained why it would be difficult to obtain latent fingerprints from the firearms and ammunition found in the car. Crawford has not asserted that he would have presented a rebuttal expert or what that expert's testimony would have been. Nor has Crawford explained how he would have conducted a more thorough cross-examination of these witnesses or how their testimony would have been inadmissible under Daubert. Furthermore, as already discussed, a reasonable jury had ample evidence to find Crawford guilty. Accordingly, a new trial is not warranted.

## E.      Reasonableness of the Sentence

We review the reasonableness of a sentence under an abuse-of-discretion standard. Gall v. United States, 552 U.S. ___, ___, 128 S. Ct. 586, 597 (2007). A sentence may be procedurally or substantively unreasonable. United States v. Hunt, 459 F.3d 1180, 1182 n.3 (11th Cir. 2006). A sentence may be procedurally unreasonable if the district court does not follow the requirements of United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), regardless of the actual sentence

---

[7]Because we conclude that any Rule 16 violation is harmless, we do not address whether the laboratory reports provided to Crawford satisfy the government's Rule 16(a)(1)(G) obligations.

imposed. Hunt, 459 F.3d at 1182. For a sentence to be procedurally reasonable, a district court must correctly calculate the guidelines range and consider the factors in 18 U.S.C. § 3553(a). United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005). "[A]n acknowledgment by the district court that it has considered the defendant's arguments and the factors in section 3553(a) is sufficient under Booker." Id. Once we determine that the sentence was procedurally reasonable, we evaluate the ultimate sentence's substantive reasonableness, considering the totality of the circumstances. Gall, 552 U.S. at __, 128 S. Ct. at 597. The party challenging the sentence bears the burden of showing that a sentence is unreasonable. United States v. Johnson, 485 F.3d 1264, 1272 (11th Cir. 2007).

Crawford contends that his sentence is procedurally unreasonable because the district court refused to consider his mental health as a factor. The record does not support this argument. The district court stated on the record that it would hear Crawford's arguments regarding his mental health, and it did hear them. It is clear the district court considered Crawford's mental illness when it explained that a variance was inappropriate because of the seriousness of the offense and the history and characteristics of Crawford. For the same reason, we also reject Crawford's argument that the district court failed to adequately explain the sentence selected. Crawford has failed to carry his burden to show his

sentence is procedurally unreasonable.[8]

## III.  CONCLUSION

For all the forgoing reasons, we affirm Crawford's conviction and sentence.[9]

**AFFIRMED.**

---

[8]Crawford does not argue that the district court's sentence was substantively unreasonable or that the district court miscalculated the advisory guidelines range.

[9]Based on binding precedent, we reject Crawford's Commerce Clause challenge to § 922(g). See United States v. Scott, 263 F.3d 1270, 1271-72 (11th Cir. 2001) (concluding that § 922(g) is facially valid under the Commerce Clause).